(No. 41042.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* RICHARD FRANKLIN SPECK, Appellant.

*Opinion filed November 22, 1968.*

180

WARD, J., took no part.

GERALD W. GETTY, Public Defender, of Chicago, (JAMES J. DOHERTY, JAMES N. GRAMENOS, and MARSHALL J. HARTMAN, Assistant Public Defenders, of counsel,) for appellant.

WILLIAM G. CLARK, Attorney General, of Springfield, and JOHN J. STAMOS, State's Attorney, of Chicago, (WILLIAM J. MARTIN, JOEL M. FLAUM, JAMES B. ZAGEL, and JAMES B. HADDAD, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE KLINGBIEL delivered the opinion of the court:

On July 13, 1966, eight young women were murdered in their townhouse residence in the city of Chicago. The grand jury of the circuit court of Cook County returned eight separate indictments charging the defendant, Richard

Franklin Speck, with the murders. The defendant moved for a change of place of trial from Cook County and the motion was allowed and the cause transferred to Peoria County. The indictments were consolidated for trial before a jury which returned a verdict of guilty on all indictments and fixed the death penalty. The court sentenced the defendant to death and the cause is now before us on appeal.

Following the transfer of the cause the defendant moved for another change of the place of trial on the ground that he could not receive a fair trial in Peoria County because of prejudice against him on the part of the inhabitants of the county. The court denied the motion and the defendant contends that the denial was reversible error.

The record is replete with exhibits consisting of allegedly prejudicial newspaper articles and records of television and radio commentaries on the case. Because of the violence of the crimes and the number of victims the slayings received wide publicity on a nation-wide scale for a period of about two weeks commencing with the date of the crime and continuing through the arrest and indictment of the defendant. These news stories were circulated to news media throughout the nation, including Peoria, by means of the Associated Press and United Press International wire services. Although the exhibits submitted by the defendant in support of his motion contain numerous copies of alleged prejudicial publicity in newspapers published in Chicago, and radio and television programs originating in Chicago, we do not believe that these exhibits are of substantial assistance in determining whether the defendant received a fair trial in Peoria. Although the statistics submitted by the State and the defendant differ, it is clear that the Chicago newspapers were not widely circulated in Peoria County. The figure submitted by the State indicated that 93% of Peoria County households did not receive any edition of any Chicago newspaper; that most Chicago newspapers reached less than 5% of these households and that

only the Sunday edition of the *Chicago Tribune* was received by as many as 7%. Defendant did not directly contradict these facts but contended that they were based upon subscriptions and did not include news-stand sales. In any event, the heavy news coverage of the crimes in the Chicago newspapers in the period immediately following the crimes was, to a large extent, repeated in the Peoria press.

Although it is possible for residents of Peoria County to receive Chicago radio and television broadcasts, Peoria County was served by five local radio stations and three local television stations. We are of the opinion that only the broadcasts of the local stations are relevant in determining the question of alleged prejudicial publicity.

The principal newspaper in Peoria County is the *Peoria Journal Star,* which reached approximately 80% of the readers in the Peoria metropolitan area. The crimes received front page attention for about a week. The stories contained: the injuries inflicted on each of the women; an account of the slayings related by the sole survivor; a police sketch of the slayer; an article stating that Speck had been named as the killer; an account of his arrest; a summary of the defendant's previous criminal record; a report that the defendant had suffered a heart attack while in custody; a report that indictments had been returned against the defendant; a report that the defendant's fingerprints had been found in the townhouse where the women were slain; a report that the sole survivor had identified the defendant; and a report that the defendant would claim insanity.

The radio and television broadcasting during the period was much in the same vein. In addition to the news articles referred to in connection with the discussion of newspaper publicity, there was one television broadcast which is particularly relied upon by the defendant in support of his claim. On July 16, before the arrest of the defendant, the then police superintendent of the city of Chicago appeared in a television interview where he displayed a picture of the

defendant and stated that the defendant had been identified as the slayer by the survivor and also by fingerprints found at the scene of the crime. He urged all citizens to report to the authorities any person who appeared to match the defendant's description. The superintendent stated that as far as he was concerned, there was no question that the suspect was the murderer. The defense also contended that in a television broadcast in December 1966, long after the defendant had been apprehended, the superintendent justified his former statement and stated that he did not think that his remarks prejudiced the defendant's right to a fair trial. However, the evidence at the hearing on the motion for a further change of the place of trial, failed to show that this interview was broadcast over any Peoria station and the court sustained an objection to its admission.

In determining whether the defendant received a trial before a fair and impartial jury, we must bear in mind that defendant had to be tried in some community in the State of Illinois. In determining the place of trial the court had to consider the necessity of selecting a community which was capable of affording adequate security for the defendant and a county in which there would be a sufficiently large number of prospective jurors. All communities in this State meeting these requirements were served by one or more wire services transmitting news to local newspapers, and were also served by local radio and television stations. Any such community would therefore necessarily have been subjected to much the same publicity to which Peoria County was subjected. The basic consideration, however, is not the amount of publicity in a particular case, but whether the defendant in that case received a fair and impartial trial, for, as stated in *Beck* v. *Washington,* 369 U.S. 541, 556, 8 L. Ed. 2d 98, 82 S. Ct. 955, where a change of venue on the ground of prejudicial publicity was denied: "Of course there could be no constitutional infirmity in these rulings if petitioner actually received a trial by an

impartial jury." The Supreme Court in *Irvin* v. *Dowd,* 366 U.S. 717, 722, 6 L. Ed. 2d 751, 81 S. Ct. 1639, laid down the following standards to be used in determining whether a defendant received a trial before a fair and impartial jury: "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."

Applying these standards, we focus our inquiry on the ultimate question of whether the jurors at the defendant's trial demonstrated that they were able to lay aside any impression or opinion which they might have had and render a verdict based on the evidence rendered in court. By agreement, the defendant was given 160 peremptory challenges. Less than half of the peremptory challenges had been exercised by the defendant at the time the final jury panel was selected. There is some dispute between the State and the defendant as to the exact number of prospective jurors who were refused because of a preconceived belief in the defendant's guilt, but it is undisputed that the number of such propective jurors was between 250 and 300. Defendant argues that the fact that so many jurors were excused for cause demonstrates that the degree of prejudice in the county was so great that defendant could not receive a fair trial. On the contrary, we are of the opinion that the large

number of excused jurors rather tended to demonstrate the care which the court exercised in assuring that the defendant had a fair and impartial jury. (*Cf. People* v. *Berry,* 37 Ill.2d 329, 332.) The 12 jurors finally selected had stated that they had no such preconceived notions of the defendant's guilt which would prevent their rendering a fair and impartial verdict, although all of them stated that they had read something about the case. The defendant accepted all of these jurors and did not challenge any of them for cause.

The situation is far different from that in *Irvin* v. *Dowd.* In that case the defendant exhausted his peremptory challenges and 8 of the 12 jurors finally selected stated that they had preconceived notions of guilt. One of the final jurors said that he could not give the defendant the benefit of the presumption that he was innocent and others stated that it would take evidence to overcome their belief. These jurors, however, stated that they could nevertheless be fair and impartial. The defendant's challenges for cause as to these jurors were denied. The Supreme Court held that in view of the admitted prejudice on the part of the jurors who actually heard the case, their statements that they could be fair and impartial were an insufficient basis upon which to find that the defendant had received a trial before a fair and impartial jury.

The situation here is much more similar to the *Beck* case. The trial here commenced in February, 1967, about 7 months after the crimes. Most of the alleged prejudicial publicity occurred in July, 1966, and for a period of several months there were either no news stories on the crimes or the stories were relegated to the back pages of the newspapers. As the date of the trial approached there were further news articles but these were factual accounts of the legal proceedings leading up to the trial and there is no contention that these articles were prejudicial. In the *Beck* case, trial was about 5 months after the indictment. The

Supreme Court pointed out that the news value of the original disclosures was diminished and news articles were relegated to inner pages of the newspapers, and that occasional front page stories were straight news stories which did not tend to arouse ill will and vindictiveness. Every juror in that case who was challenged for cause by the defendant was excused. All jurors finally selected stated that they were not biased; that they had formed no opinion as to the defendant's guilt; and that they had an open mind. The court pointed out that the fact that defendant did not challenge for cause any of the jurors finally selected was strong evidence that he was convinced that the jurors were not biased.

The crime here was of a sensational nature and it was inevitable that some of the publicity would be of the same character. We are satisfied, however, from a review of the numerous exhibits and the *voir dire* examination of prospective jurors that the defendant received a trial from a fair and impartial jury in Peoria County and that the court did not err in denying a motion for a further change in the place of trial.

After the cause had been transferred to Peoria County, the defendant filed a motion for a substitution of judges. It is clear that this motion was submitted under section 114—5(a) of the Code of Criminal Procedure, (Ill. Rev. Stat. 1967, chap. 38, par. 114—5(a), providing for an automatic substitution of judges without proof of actual prejudice if such a motion is filed within 10 days after the case has been placed on the trial call of the judge. Section 114—5(c) of the Code provides a further procedure for obtaining a substitution of judges based upon a showing of actual prejudice on the part of the judge. Defendant did not submit any affidavit or evidence to show actual prejudice, but contends that under the automatic substitution provision the judge had no choice but to grant the motion. Prior to the transfer to Peoria County, preliminary pro-

ceedings in Cook County had been conducted before the Honorable Herbert C. Paschen, Judge of the Circuit Court of Cook County. Judge Paschen had already presided over a pretrial sanity hearing, had granted the motion for change of place of trial and had denied a motion to dismiss the indictments. When the cause was transferred to Peoria County the Chief Justice of this court assigned Judge Paschen to hold court in Peoria County for the duration of the trial of this case and the Chief Judge of the Tenth Judicial Circuit then placed the case on Judge Paschen's trial call. Defendant filed a motion for substitution of judges within 10 days after the case had been placed on the trial call in Peoria County and he contends that the filing of the motion was timely. This court has always held that a motion for an automatic substitution of judges comes too late after the judge has ruled on matters going to the merits. (*People* v. *Wilfong,* 17 Ill.2d 373.) Defendant had not requested a substitution of judges before any of the Cook County proceedings and his motion came too late, even though it was technically filed within 10 days after the case had been placed on Judge Paschen's trial call.

The defendant raises a further point with respect to the procedure at the trial. Prior to trial the court entered an order restricting the publicity to be given various trial proceedings. The order provided, among other things, that the names and addresses of selected, excused, or prospective jurors should not be published until after a verdict had been returned. Shortly thereafter, by agreement between the prosecutor and defense counsel, the order was modified to provide that the names and addresses of selected jurors should not be published until after all selected jurors and alternates had been sworn and sequestered. One day after the parties had agreed upon this modification, but before the amended order had been reduced to writing, an original petition for a writ of *mandamus* was filed in this court by the Tribune Company, the publisher of a Chi-

cago newspaper, against the trial judge, seeking a declaration that the original order restricting publicity was invalid. The defendant sought leave to intervene in that proceeding but we denied this request. We entered an interlocutory order providing, among other things, that the order of the trial court should be modified so as to provide that the names of prospective jurors should not be reported until such individuals were either excused or sworn as jurors and sequestered. Thereafter, on motion of the petitioner, the *mandamus* petition was dismissed without prejudice. After these proceedings, and while the parties were still examining prospective jurors, defendant moved that the original order of the trial court be reinstated, but the court denied the motion. It is contended that this ruling was erroneous. The argument is based almost entirely on the transcript of the *voir dire* examination of one juror. This juror stated that he feared that it might reflect upon his family if he signed a verdict releasing the defendant after all the publicity in the case. He also said that he would not want his name publicized if he signed a guilty verdict. It is apparent from the examination of this juror that he was not so much concerned with having his name published as a selected juror as he was with having his name published after the verdict was rendered. The defendant does not now claim and did not claim in the trial court that the court should restrain the publication of the names of jurors after verdict and, in fact, sought a reinstatement of the original order to provide that their names should not be published until after verdict. The transcript of the examination of this juror does not lend support to defendant's argument that publication of the names of the jurors after they had been selected and sworn was prejudicial to the defendant. In view of the defendant's prior agreement to the entry of such an order, the fact that no prejudice has been established, and the fact that the order which remained in effect was in accordance with this court's order, we are of the

opinion that the trial court did not err in refusing to reinstate the original order.

We next consider defendant's claim that the evidence was insufficient to establish his guilt beyond a reasonable doubt. The principal witness for the prosecution was Corazon Amurao, a native of the Philippines, who was in Chicago as an exchange nurse. She lived in a townhouse apartment building on the south side of Chicago with seven other young women, all of whom were either exchange nurses or student nurses. On the night of July 13, 1966, at about 11 o'clock, she was awakened by a knock on her bedroom door and upon opening the door she was confronted by a man holding a gun, whom she identified as the defendant. Miss Amurao and her roommate fled to another bedroom and the two women, together with a woman into whose bedroom they fled, ran into a closet and closed the door. They remained there for several minutes and then heard a female voice asking them to come out of the closet. This unidentified person said that the man was not going to harm anyone. When the three left the closet Miss Amurao saw the defendant holding another woman around the waist and two other women standing in the room near him. The defendant, who still had a gun, directed the six women to sit on the floor and they complied with his request. One of them asked the defendant what he wanted and he said that he wanted money to go to New Orleans. The women said that they would give him money and the defendant permitted three of them who lived in the bedroom to stand up and get money from their purses. Another said that she had money in her purse in another room and at the defendan's request all of the women walked to the other room where the woman handed some money to the defendant, after which they went back to the bedroom where they had been seated. They then heard a female voice downstairs and soon thereafter another woman came upstairs and entered the bedroom where she was confronted by the defendant

and directed to sit down. The defendant asked this woman for money and she handed him some.

The defendant then cut a bed sheet into strips and commenced tying up each of the women. As he was tying the fifth one, the downstairs doorbell rang. The defendant directed Miss Amurao and another woman to accompany him downstairs where Miss Amurao opened the front door. There was no one at the door and the defendant and the two women went back upstairs. The defendant then finished tying up all of the women, after which he untied one of them and led her out of the room. While the defendant and this woman were out of the room two other women came into the bedroom where all of the women were tied. The defendant came in immediately thereafter and directed these two women to follow him out of the room. Miss Amurao heard noises as if these women were struggling and in about 20 minutes the defendant returned. One by one he untied a woman and led her from the room and returned for another. Miss Amurao hid under a bed. When the defendant came to the last of the women, with the exception of Miss Amurao, he undressed her and got on top of her on one of the beds, after which he took this woman out of the room. Miss Amurao remained under the bed for about two hours until an alarm clock went off at 5 :30 in the morning. She then managed to untie herself and inspected ·the other rooms in the building. She saw one body in the bathroom, three bodies in one bedroom and three bodies in another bedroom and went to the window and screamed for help. When a police officer arrived on the scene he discovered the body of another woman on the livingroom couch.

A pathologist testified that 6 of the bodies bore stab wounds and five bodies showed evidence of strangulation. In three cases the victims had been both stabbed and strangled.

The State also introduced testimony of two fingerprint

experts that three fingerprints found at the scene of the crime were those of the defendant.

The State's evidence also showed that on July 12 the defendant went to the National Maritime Union Hall, which is located across the street from the townhouse, and received an assignment to report to a ship. He rode to the ship with a man he had met at the hall but did not receive the assignment. He rode back to the union hall at which time he remarked that he intended to go to New Orleans to ship out. He then went to a service station several blocks from the hall where he left his luggage, stating that he was going to look for a room. The defendant did not return to the station that night but on the following morning he appeared and picked up his luggage. He then went to the Shipyard Inn, which was a tavern and rooming house, where he registered under his real name and paid a week's rent in advance. On the evening of July 13 he was in the bar of the Shipyard Inn and one witness testified that the defendant had a knife in his possession and another witness testified that the defendant had a gun. According to the witness the defendant left the Inn, which was about two miles from the townhouse, at about 10 P.M.

Further testimony showed that on July 14 the defendant was in the Shipyard Inn when he received a telephone call: He left stating that he had found a job and was going to check out. The defendant took a cab to the north side of Chicago and got out in front of a housing project. He did not go into the housing project but walked down the street and later in the afternoon registered at a hotel on the near north side under an assumed name. He spent one night at that hotel and then obtained a room in a hotel on the near west side of Chicago. On July 16 the police were notified that a man in the hotel had been injured. The injured man was the defendant who had a cut on his left arm and another cut on his right wrist. He was taken to the hospital where the attending physician noticed a tattoo on the de-

fendant's arm which matched the description given in police bulletins and the newspapers as the tattoo on the man wanted as the suspect in the killings. The doctor notified the police and defendant was placed under arrest.

The defense introduced testimony of members of the defendant's family concerning his early life, education, *etc.* Two witnesses, who were employees of a tavern and restaurant near the Shipyard Inn, testified that the defendant was in the tavern on the night of the crimes early in the evening and that he left and returned at about midnight and stayed until at least 12:30 A.M.

Before deciding the claim that the evidence was insufficient we must consider defendant's argument that the court should have held a hearing on a motion to suppress the courtroom identification of defendant by Miss Amurao. She was taken to the hospital where the defendant was confined after his arrest, where she identified the defendant. Counsel had not at that time been appointed and there was no attorney for the defendant present at the identification. Relying upon *Stovall* v. *Denno,* 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967, the defendant contends that this pretrial identification was so fundamentally unfair and conducive to mistaken identification that defendant was deprived of due process of law. The defendant contends that the hospital identification tainted the identification testimony of Miss Amurao to the extent that her in-court identification of the defendant was inadmissible. In *Stovall* v. *Denno,* the Supreme Court held that the rule in *United States* v. *Wade,* 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926, and *Gilbert* v. *California,* 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951, invalidating pretrial identifications conducted in the absence of counsel for the defendant, was not retroactive, and applied only to confrontations occurring after June 12, 1967. Therefore, the absence of counsel at the pretrial identification does not render the identification

invalid as a matter of law. However, the Supreme Court in *Stovall* held that a defendant was free to attempt to establish that the identification proceedings were so wanting in fairness as to deprive him of due process of law, and that is the defendant's contention here. The record shows that Miss Amurao was brought to the defendant's hospital room where he was the only patient in the room. Someone, possibly a police officer, grabbed the defendant's head and turned his face in the direction of Miss Amurao. As she left the room she told a police officer that defendant was the killer. There is nothing in the record to show that the police officers in any way improperly induced the witness to make this identification. The Supreme Court in *Stovall* v. *Denno,* pointed out that the practice of showing suspects singly to persons for purposes of identification has been widely condemned, but also pointed out that a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it. We find nothing fundamentally unfair in the identification procedure here. The witness had had an opportunity seldom if ever equalled in any murder case, to observe the killer during the several hours he was in the townhouse, and had identified the defendant's picture before the hospital identification. Our language in *People* v. *Nelson,* 40 Ill.2d 146, 151, in which a similar claim was presented, is applicable here. We said, "The defendant's argument flies in the face of the record which clearly shows that the defendant was identified * * *, independently of and uninfluenced by any viewing at the attempted lineup." The court did not err in denying a request to conduct a hearing on a motion to suppress the identification testimony.

In attacking the sufficiency of the evidence the defendant states that the identification testimony of Miss Amurao was doubtful, vague and uncertain. In her cross-examination it was brought out that she had viewed a book contain-

ing many pictures; that she saw one picture in the book that was similar to the killer; and that she identified a loose picture which was not in the book as being more similar to the killer. This picture was, in fact, a picture of the defendant. It was also brought out that she gave a description of the man to a police artist who prepared a sketch. In her cross-examination she stated that she could not recall telling the artist about the man's lips, nose, eyes, eyebrows and ears, and also that she could not recall anything about these features of the killer. The defendant contends that because she said only that the defendant's picture was "more similar" instead of making a positive identification, and because she could not recall the individual features of the killer, her identification testimony is entitled to no weight. As we previously noted, the evidence showed that she had an unparalleled opportunity to observe the killer. This evidence and the evidence on cross-examination was all brought out before the jury and it was their function to determine the credibility of the witness.

The defendant also argues on the issue of the sufficiency of the evidence that the jury should not have disregarded the alibi evidence. This court has held that alibi evidence should not be disregarded where the sole and only evidence contradicting it rests upon the identity of the defendant. (*People* v. *Gardner,* 35 Ill.2d 564; *People* v. *McGee,* 21 Ill.2d 440.) However, in these cases the identification testimony was not as strong as it is here, nor was there corroboration of the identification testimony. Here the jury had before it not only Miss Amurao's testimony, but evidence that the defendant's fingerprints were found at the scene. Where positive identification is made a guilty verdict may be sustained notwithstanding there may be otherwise uncontradicted alibi evidence. (*People* v. *Setzke,* 22 Ill.2d 582; *People* v. *Lamphear,* 6 Ill.2d 346.) We hold that the positive identification, the fingerprints, the evidence of defendant's presence near the scene, his possession of a gun

and knife on the night of the crimes, and his flight under an assumed name after the crimes, were sufficient to establish his guilt beyond a reasonable doubt.

The defendant makes several claims concerning the fingerprint evidence. Two latent fingerprints were found near the knob of one of the bedroom doors and one latent print was found near the bottom of the door. The commanding officer of the Identification Section of the Chicago Police Department testified that he had compared the three latent prints and photographs thereof, with fingerprints taken from the defendant. It was his opinion that one of the upper prints was identical with the print of the defendant's right index finger. He testified that there were 10 points of identity that he could establish between the two impressions. He testified that the other upper print was identical with the right middle fingerprint of the defendant and testified that there were 17 points of identity between these impressions. As to the lower print, he testified that it was identical with the left middle fingerprint of the defendant and testified that he found 17 points of identity. He testified that in the science of fingerprints, 10 to 12 points of identity are sufficient to establish positive identity, and that it was generally accepted in all of the literature that in no case were more than 12 points of identity necessary.

Another witness, Andre Moenssens, the head instructor in fingerprint identification at the Institute of Applied Sciences, testified that he had compared the lower latent print with the defendant's fingerprints and was of the opinion that the latent print was identical with the print of the defendant's left middle finger. He found 17 points of identity between the prints and testified that from 8 to 12 such points were sufficient.

The defendant first contends that the two witnesses were not qualified to testify as experts. In the first place, we note that the defendant did not object to the qualifications of these witnesses at the trial, and is in no position

to raise this issue for the first time on appeal. However, in view of the fact that the extreme penalty has been imposed in this case, we consider the point. The first officer testified that he had been interested in and had studied the science of fingerprinting since he first became a patrolman, about 18 years prior to the trial. He had taken a course in fingerprinting at the Institute of Applied Sciences, had studied under the direction of other police officers skilled in the subject, had read numerous books, periodicals and magazines on the subject, and had made many thousands of fingerprint comparisons. The other witness had studied fingerprinting in Belgium, had written a course in fingerprinting and had graduated with high honors from the Institute of Applied Sciences. He had written numerous articles on fingerprint identification and was in the process of writing a fingerprint encyclopedia. He was the associate editor of *Fingerprint and Identification Magazine*. He was a Fellow in the Academy of Forensic Sciences and had lectured on fingerprinting at law schools in the city of Chicago. The question of the qualifications of an expert witness rests largely within the discretion of the trial court, and in our opinion the two witnesses possessed the required qualifications to testify as experts on fingerprint comparison.

The next argument with respect to the fingerprint evidence is that the court erred in refusing to give the following instruction: "The Court instructs the jury that any evidence received as to identity of fingerprints is what is known in the law as opinion evidence only, and such evidence is not conclusive evidence of a fact. In this regard, the Court further instructs the jury that the weight to be accorded that type of evidence is a question for the jury to decide in the light of all the facts and circumstances proved in the trial." This instruction singled out one type of evidence and stated that it was not conclusive evidence. Instructions calling the attention of the jury to particular

facts and singling out certain evidence have been condemned. (*People* v. *Henderson*, 378 Ill. 436, 448.) The Illinois Supreme Court Committee on Jury Instructions has recommended that no instruction on weighing expert testimony should be given, in either a civil or criminal case, stating that there is no good reason why the weight of expert testimony should be subject to criteria different from that for other witnesses, and pointing out that this is a subject which is particularly within the province of argument by counsel. (I.P.I. Civil, No. 2.10, p. 29; I.P.I. Criminal, No. 3.05.) The court did not err in refusing to give the tendered instruction here.

The defendant also contends that the opinions of the witnesses were unsupported by any reasons for their opinions. This objection seems to be directed to a police officer's testimony concerning the two upper prints. As to these he did not detail the points of identity, nor point them out to the jury on exhibits. The exhibits were available to the defense and the witness could have been cross-examined by defendant's counsel on the points of identity by use of the exhibits. The fact that the officer did not point out each similarity to the jury on his direct examination does not destroy the value of his testimony.

The defendant further argues in connection with the fingerprint evidence that the jury should have been permitted to examine the fingerprint evidence to determine the weight to be given the testimony of the expert witnesses. Numerous fingerprint exhibits were circulated among the jurors and the defendant's claim that the jury was not permitted to view the exhibits is without basis in the record. It is also urged that the jurors should have been permitted to examine the fingerprint exhibits with the aid of a magnifying glass. There is authority that the use of a magnifying glass is proper. (*Howard* v. *Illinois Trust and Savings Bank*, 189 Ill. 568, 577.) But this does not require a holding that refusal to permit examination of exhibits under

magnification is error. The classification of fingerprints and their method of identification is a science requiring study and is a matter in which experts have peculiar knowledge not common to the world. (*People* v. *Jennings,* 252 Ill. 534, 550.) We cannot say that the court erred in refusing to permit the jury to compare the fingerprint exhibits with the aid of a magnifying glass.

Also, with respect to the fingerprint evidence, the defendant claims that the prosecutor's final argument was improper. Specifically, defendant complains that the prosecutor referred to defense counsel's cross-examination of one of the experts as an "exhibition" designed to confuse the jury; that the prosecutor said that fingerprint evidence was an exact science and that both experts had so testified; that the expert witnesses were two of the finest in the country; that each of the experts had testified as to three fingerprints whereas Moenssens testified only as to one; that Miss Amurao had sworn that the prints on the door were those of the defendant; and that there were three prints on the door at the time of the trial, whereas there was only one, two of the prints having been "lifted". We have reviewed the entire argument. The defendant did not object to any of the matters now complained of and in our opinion the argument, as a whole, taken in context, was not unfair.

A further argument concerning the fingerprint evidence is that one of the exhibits had been altered. The officer who lifted the prints testified that he first dusted the area with powder and then wrote certain identifying marks in the powder surrounding the prints consisting of the address, the date and his initials. He then placed an adhesive cellophane lift over the prints and the markings, removed the lift and placed it on a specially treated backing. The exhibit does not now contain the identifying markings, although the latent prints do appear on it. It is not entirely clear whether the markings were on the exhibit at the time it was ad-

mitted in evidence. At the time of the trial the officer gave a demonstration of how he originally separated the cellophane from the backing, placed it on the door, lifted it and then replaced it on the backing. It is possible that the identifying marks were removed at that time. We do not believe that it is necessary to indulge in such speculation, however. The only objection to the admission of the exhibit was in the following language: "Well, I will note an objection for the record as to that. I assume it has been properly laid, but I just don't want to agree to it." In the absence of a more specific objection that the exhibit had been altered, the objection urged in this court has been waived. Furthermore, it appears that the fingerprint expert did not make his comparisons from the lift itself, but identified one fingerprint from a photograph of the lift and another from a photograph of the print on the door. Each of these photographs showed the identifying marks. The court did not err in admitting the cellophane lift into evidence.

One final claim is made concerning the fingerprint evidence. When the prosecutor called Andre Moenssens as a fingerprint expert the defendant objected on the ground that Moenssens had been employed by defense counsel to assist him in evaluating the fingerprint evidence, and had, at counsel's request, reviewed the fingerprints found at the scene of the crime and expressed certain opinions thereon. Defendant's counsel contends that he was taken by surprise since no notice had been given that the State would call Moenssens and his name was not on the list of witnesses and also argues that since Moenssens was retained by defense counsel to assist the defense, testimony on behalf of the State violated the attorney-client privilege.

Insofar as the claim of surprise is concerned, we are of the opinion that defendant's contention cannot be sustained. It is within the discretion of the court to permit a witness to testify whose name is not on the list of witnesses furnished the defense, and this discretion will not be dis-

turbed unless the defendant sustains the burden of showing surprise. (*People* v. *Clay,* 38 Ill.2d 17, 22.) While in a sense, the defendant may have been surprised that the State elected to use Moenssens, defense counsel could hardly be surprised by his testimony since he had previously conferred with the witness and knew that he would testify that one of the prints found on the door was identical with the print of the defendant. The court gave defense counsel an opportunity to confer with Moenssens prior to his testimony but counsel elected not to do so. As we pointed out in the *Clay* case, counsel is now in no position to claim that the court erred in permitting Moenssens to testify.

The claim that Moenssens' testimony violated the attorney-client privilege must likewise be rejected. A witness is not the property of either party to a suit and simply because one party may have conferred with a witness and even paid him for his expert advice does not render him incompetent to testify for the other party. Defendant's argument ignores the fact that the privilege pertains only to *communications* between an attorney and a client and is based upon the confidential nature of such communications. Moenssens' testimony was limited to expert opinion as to the fingerprints and there was no testimony as to any conversations between him and the defendant or defendant's attorney. Cases such as *People* v. *Ryan,* 30 Ill.2d 456, dealing with communications between an insured and an insurance investigator; *State* v. *Kociolek,* 23 N.J. 400, 129 A. 2d 417, dealing with information a psychiatrist had received from interviews with the defendant; and *City and County of San Francisco* v. *Superior Court,* 37 Cal.2d 227, 231 P.2d 26, also dealing with communications between a client and a psychiatrist, are inapplicable here since they all deal with communications received from a party to the litigation. The defendant relies, to a great extent, upon *City of Chicago* v. *Harrison-Halsted Building Corp.,* 11 Ill.2d 431, an eminent domain proceeding. The defendant

sought to obtain by pretrial discovery information as to the appraisals made by two of the city's witnesses. The trial court refused to permit this discovery, apparently on the ground that the information was privileged as having been made in preparation for trial, but held that the witnesses could be examined at the trial as to their opinions of value. This court held that pretrial offers by condemning authorities were in the nature of attempts to compromise and therefore could not be proved, and held that the defendant therefore had no right to obtain by discovery the evidence upon which the offer was based. The court went on to say that irrespective of this reason, the defendant was not entitled to the information sought because it was made in preparation for trial and was privileged. The court stated that such evidence need not be disclosed, either through discovery or at the trial. This latter language was not necessary to the decision of the case, which was based upon the familiar rule that offers to compromise may not be shown. In our opinion this case is insufficient authority upon which to hold that Moenssens' testimony was privileged.

A further contention is that the court erred in admitting certain alleged prejudicial evidence. It is argued that the defendant was prejudiced by reason of the fact that close relatives of the slain girls were called by the prosecution as "life and death" witnesses to establish the identity of the girls and the fact that they were deceased. Counsel for the defendant says that he was willing to stipulate to the identity of the girls and to the fact that they had met their deaths by criminal means. However, the defendant pleaded not guilty and the State had the right to prove every element of the crime charged and was not obligated to rely on the defendant's stipulation. (*People* v. *Botulinski,* 392 Ill. 212.) As stated in *People* v. *Scheck,* 356 Ill. 56, 62 : "It has never been held that the State is barred from proving a fact because the defendant offers to admit it, but, on the

contrary, the rule is that when a trial is upon a plea of not guilty the State is permitted to go ahead and introduce its full proof of the crime charged in the indictment." There was no undue emphasis, in the proof or in argument, of the fact that the victims left a family surviving, and cases such as *People* v. *Bernette,* 30 Ill.2d 359, and *People* v. *Dukes,* 12 Ill.2d 334, are not applicable.

A similar claim is made by the defendant with respect to the testimony of the pathologist who testified as to the wounds and strangulation of the victims and the same answer is appropriate. The defendant had offered to stipulate that the pathologist had examined the bodies of the women and that they had met their deaths by either strangulation or knife wounds. Again the prosecutor is not bound to rely upon the stipulation, and had the right under the defendant's plea of not guilty to prove the cause of death and the severity of the attacks upon the women.

The defendant also contends that because he had agreed to stipulate to the identity of the decedents and to the causes of their deaths, admission in evidence of photographs of the bodies of the deceased women was prejudicial error. The defendant's claim is that the photographs lacked any probative value and were so shocking in nature that they would inflame the passions of the jurors. It is the rule that where photographs are relevant to establish any fact in issue that they are admissible in spite of the fact that they may be of a gruesome nature. In *People* v. *Jenko,* 410 Ill. 478, the court said : "Evidence having a natural tendency to establish the facts in controversy should be admitted. A party cannot have competent evidence excluded merely because it might arouse feelings of horror and indignation in the jury. Any testimony concerning the details of a murder or other violent crime may have such tendencies, but manifestly this could not suffice to render it incompetent. Of course, where spectacular exhibits having little probative value are offered for the principal purpose

of arousing prejudicial emotions they should be promptly excluded. But questions relating to the character of the evidence offered, and the manner and extent of its presentation, are largely within the discretion of the trial judge, and the exercise of that discretion will not be interfered with unless there has been an abuse to the prejudice of the defendant." In that case the court held that there was no error in admitting into evidence photographs of a deceased girl's body showing the various wounds inflicted upon her. In *People* v. *Kolep,* 29 Ill.2d 116, the trial court admitted into evidence photographs of a deceased woman as she had been found and also photographs of her body at the morgue. The trial court had ruled that the pictures were admissible to show the condition of the victim's clothing, certain bruises on her body, and to show the amount of force that had been used, and we held that the ruling of the trial court was not in error, in spite of the shocking nature of the pictures. In *People* v. *Myers,* 35 Ill.2d 311, the defendant argued that photographs of the deceased should not have been admitted into evidence because the police officer had described the body as they had found it and the photographs could serve only to anger and inflame the jury. We held that the admission of photographs of a decedent is discretionary with the trial judge and ruled that the judge had not abused that discretion.

In this case the photographs of the deceased girls showing the location of the bodies in the various rooms corroborated, to some extent, the testimony of Miss Amurao. The photographs also illustrated the manner in which the hands and feet of the victims were bound, further corroborating Miss Amurao's testimony. The bindings also tended to show premeditation and planning on the part of the killer and negated any claim that the slayings were done in an insane frenzy. The photographs also helped to establish the degree of force used by the killer. The State was not precluded from using these photographs to establish a

case of deliberate premeditated murder simply by reason of the fact that the defendant agreed to stipulate to the identity of the deceased girls and the causes of their deaths. The admission in evidence of these photographs was not prejudicial error.

Akin to the foregoing arguments, the defendant claims that certain exhibits should not have been used. In connection with the testimony of Miss Amurao, the prosecution utilized a scale model of the townhouse. Wooden blocks, shaped roughly in the form of a seated figure, were used to designate the women while they were alive, and rectangular blocks were used to designate the places where the bodies were found. The defendant says that the figures resembled women kneeling in prayer and that the rectangular blocks resembled coffins, and claimed that these exhibits were used only to inflame and prejudice the jury. From the summary of Miss Amurao's testimony set forth herein, it is apparent that the sequence of events and the various locations within the townhouse would be difficult for the jury to follow without the use of some physical exhibits. Further, the trial court in overruling a defense objection to the use of the exhibits, noted that there was a language problem with Miss Amurao because of her accent. In our opinion the exhibits were a useful adjunct to the testimony and were not of such a nature as to be prejudicial.

Three arguments are made concerning defendant's mental competency. Prior to trial the court on its own motion appointed a panel of experts to determine the competency of the defendant to stand trial and later empaneled a jury for the purpose of determining this question. At the hearing, seven physicians testified, all but one of whom were specialists either in the field of neurology or psychiatry. All of the doctors testified as to their examination of the defendant and each expressed an opinion that the defendant understood the nature of the charge against him and was able to co-operate with counsel. At the conclusion

of the hearing the trial court directed the jury to return a verdict finding that the defendant was competent to stand trial and the defendant claims that the court erred in directing a verdict.

The defendant claims that the testimony of the doctors on cross-examination was sufficient to raise a question as to defendant's incompetency which should have been submitted to the jury. These doctors related the personal history given them by the defendant and most of them stated that it appeared from this that the defendant was a heavy user of alcohol and probably an alcoholic. The personal history also indicated that the defendant used barbiturates. There was also some indication in the cross-examination that the defendant had told some of the doctors that he had suffered head injuries at various times. The testimony of all doctors assessed the defendant's intelligence range as being low average to average. However, the doctors were all unshaken in their opinion that the defendant understood the nature of the proceedings against him and was able to co-operate with counsel in his defense. The ultimate test as to whether a trial judge should direct a verdict is found in *Pedrick* v. *Peoria and Eastern Railroad Co.,* 37 Ill.2d 494, 510, as follows: "In our judgment verdicts ought to be directed * * * only in those cases in which all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." In this case there was no evidence at all that defendant was unable to understand the nature of the proceedings or unable to co-operate with counsel, and all of the evidence showed that he was competent. It is well established that a verdict of competency may be directed in a proper case. (*People* v. *Brown,* 31 Ill.2d 415, 420; *People* v. *Woods,* 26 Ill.2d 557, 561.) Under *Pedrick* standards the direction of a verdict of competency was not error.

The second contention concerning defendant's compe-

tency involves a post-trial motion. After the verdict of the jury had been returned, but before the court imposed sentence, the defendant moved that he be given a further series of electroencephalographs to determine whether the defendant was suffering from any organic brain injury, or subject to epileptic furor. In support of the motion counsel submitted the testimony of a physician that a prior electroencephalogram was incomplete because it was not taken while the defendant was asleep. It was proposed that the defendant be induced to sleep by the use of drugs, if necessary, at which time a test would be taken and that the defendant also be tested after consuming a quantity of alcohol. The State opposed the motion and submitted the testimony of three doctors, the essence of which was that further testing was unnecessary and would be inconclusive. One of the doctors stated that alcohol is not routinely used in any recognized laboratory that he knew of, and another stated that it was not good science to attempt to induce an abnormal condition in the brain they are examining, and also stated that any epileptic furor would probably only last a few minutes and certainly not for a period of hours. Permitting a further test of the nature proposed by the defendant was in the discretion of the court, and in view of the testimony of the physicians who testified for the State, we hold that the court did not abuse its discretion.

The third issue relating to defendant's competency is a claim that the court should have granted defendant's motion for a two-stage trial, where the issue of whether the defendant committed the offenses would first be determined and thereafter, if the jury found against the defendant, a second hearing would be held to determine if defendant was sane at the time of the offenses. There is no statutory authority for such procedure in this State and the uniform practice has been to submit the issue of insanity at the time of the crime to the same jury which hears the principal case. *Brown* v. *People,* 8 Ill.2d 540, 546.

However, the defendant's argument is not based upon any claim of a statutory right to a two-stage trial, but upon the claim that the court had discretion under the common law to order such a trial and that refusal to do so deprived defendant of due process of law, abrogated his privilege against self-incrimination and denied him the equal protection of the laws. The argument is that the defense of alibi is so inconsistent with the defense of insanity that substantial prejudice would result from submitting both defenses to the jury on the issue of defendant's guilt. It is also argued that the defendant made incriminating statements to the psychiatrists who had examined him and that these statements would probably be brought out before the jury, thus damaging defendant's defense.

Although the defendant has directed our attention to cases from other' jurisdictions indicating that a two-stage trial may be proper in a certain case (*Holmes* v. *United States* (D.C. cir.), 363 F.2d 281; *State* v. *Raskin,* 34 Wis. 2d 607, 150 N.W.2d 318) no authority has been cited holding that an accused is constitutionally entitled to a separate trial on the issue of insanity at the time of the crime. We recently had occasion to consider substantially the same issue in *People* v. *Ford,* 39 Ill.2d 318. There the defendant had requested a pretrial hearing to determine her sanity at the time of the crime and we held that denial of such a hearing did not deprive the defendant of any constitutional right. The Supreme Court of New Jersey has very recently had occasion to discuss the question. In *State* v. *Forcella,* 52 N.J. 263, 245 A. 2d 181, the issue was whether a defendant was entitled to separate trials on the issues of guilt and punishment. In holding that he was not, the court said, p. 194: "Of course, that kind of dilemma is not novel. A defendant who would contend that the homicide was accidental, or justified, or excused, or that he was not guilty because of insanity, or that because of provocation his offense was no more than manslaughter, faces the insoluble

problem of maintaining such a stance without seeming to concede he did the killing. Nonetheless a defendant is not entitled constitutionally to a separate trial upon each issue in the case." We hold that the court did not err in denying defendant's motion for a separate trial on the issue of insanity.

We turn now to defendant's claim that the death sentence must be set aside, which is based upon *Witherspoon* v. *Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, decided after defendant's trial. In that case the defendant had been sentenced to death by an Illinois jury and nearly half of the venire of prospective jurors had been excused for cause on the ground that they had religious or conscientious scruples against capital punishment. The Supreme Court held that it was constitutionally permissible to exclude from a jury in a capital case, those who say that they could never vote to impose the death penalty, or who would refuse even to consider its imposition in the case before them. However, the court held that exclusion of jurors simply on the ground that they had scruples against capital punishment, without further inquiry to determine whether the juror could vote to inflict a death sentence, deprives a defendant on his right to a trial by a fair and impartial jury. The basis of the decision seems to be that a large segment of the community is opposed to capital punishment and, since a defendant is entitled to a jury which represents a cross section of the community, exclusion of all persons with such beliefs produces "a jury uncommonly willing to condemn a man to death". (*Witherspoon* v. *Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, 1776.) However, the court held that exclusion of the jurors in *Witherspoon*, and similar exclusions in other cases, does not render the conviction invalid, but only requires that the death sentence be set aside. In a case decided after *Witherspoon*, the Supreme Court summarized its holding in the following language: "In *Witherspoon* v. *State of Illinois*, 391 U.S.

510, 88 S. Ct. 1770, 20 L. Ed. 2d 776, decided today, we have held that a death sentence cannot constitutionally be executed if imposed by a jury from which have been removed for cause those who, without more, are opposed to capital punishment or have conscientious scruples against imposing the death penalty." *Bumper* v. *State of No. Carolina,* 391 U.S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788, 1790.

In the present case certain jurors were excused for cause when they stated that they had religious or conscientious scruples against capital punishment or were opposed to capital punishment, without stating that they would never sign a death sentence verdict or consider its imposition. Defendant contends that the exclusion of these jurors brings this case within the *Witherspoon* doctrine and requires that the death sentence be set aside. For the reasons hereafter stated we cannot agree.

The circumstances under which the *voir dire* examination here was conducted were quite different from those in *Witherspoon.* In that case the court noted that the tone was set when the trial judge said early in the *voir dire,* "Let's get these conscientious objectors out of the way without wasting any time on them." In this case there was no hint of a desire for haste or for a perfunctory examination to see how many jurors could be disqualified on the statutory basis alone. On the contrary, the tone of the proceedings here indicated a sincere desire on the part of the prosecutor and the court (although perhaps not shared by the defense) to determine the jurors' qualifications according to the standard later held acceptable in *Witherspoon.* Early in the *voir dire* a prospective juror indicated that she was not sure whether she had scruples against inflicting the death penalty in a proper case. The prosecutor explained: "There are some people who have, either because of religious beliefs or a matter of their own conscience, a feeling that they would never sign a verdict fixing a person's punishment at death, after they had been convinced of his guilt beyond a

reasonable doubt, in any case. I am asking you if you are that type of person. Do you have conscientious scruples against inflicting the death penalty in a proper case?" Defense counsel objected to the form of the question but the court overruled the objection.

Somewhat later, defense counsel objected to an inquiry as to whether a prospective juror could return a verdict of guilty and fix the defendant's penalty at death. Defendant again objected to the fact that the prosecutor invariably preceded his questions concerning the juror's attitude toward the death penalty with a statement that one of the possible penalties for the crime of murder was the death penalty and with the remark that in this case the State would ask the jury to inflict the death penalty. Defense counsel contended that this type of examination amounted to "brainwashing" the jurors so as to give undue emphasis to the death penalty. The prosecutor replied that the specific questions and answers were very appropriate and that it was proper for either side to inquire if a juror would sign a verdict fixing defendant's penalty at death. He noted that the jurors did not always understand the question whether they had religious or conscientious scruples against the death penalty and said that he wanted to bring into focus the question whether or not they would sign a verdict fixing the penalty at death. The court overruled the defense objection and told of an instance in his experience where an intelligent juror, who was a college graduate, first stated that he had no scruples against the infliction of the death penalty and that he believed in it, but later told the judge that he could not sign the verdict fixing the death penalty. The court said that the State was entitled to know whether the juror was of that frame of mind.

On several other occasions, the prosecutor explained to prospective jurors that what the State was trying to find out was whether they had any personal beliefs that would prevent them from signing a death sentence verdict if they

thought it was a proper case. On one occasion defense counsel objected but the court overruled the objection saying that it was very important to know if the juror would sign a death verdict in a proper case.

Such detailed inquires were not made of all prospective jurors and not every juror who was excused for cause because of his objection to capital punishment was specifically asked whether he would never impose the death sentence or would refuse to consider its imposition. However, we must look again to the atmosphere of the proceeding. Prior to interrogation of prospective jurors, the State read the indictments which had been returned against the defendant, so that all prospective jurors knew that the defendant was being tried in one proceeding for the murder of eight women. In almost all of the cases where a prospective juror was excluded because he stated that he had scruples against inflicting the death penalty, the qualifying question was preceded by an explanation by the prosecutor. The language used in this explanation, with little variation, was as follows: "One of the possible penalties in Illinois for the crime or crimes of murder is the death penalty. The State in this case will ask that the jury return a verdict or verdicts fixing the defendant's punishment at death." The prosecutor then asked whether a prospective juror had scruples against inflicting the death penalty in a proper case. In at least 9 instances this question brought the volunteered response that the prospective juror would not vote to inflict the death penalty; could not sentence a man to death; would not take a life; could not, in all conscience, vote for the death of another person, or similar responses. These volunteered responses show that the veniremen understood the purpose of the prosecutor's inquiry and there can be little question but that the responses of these prospective jurors disqualified them under the *Witherspoon* standard. In 17 other instances a prospective juror, instead of answering the scruples question "Yes" or "No," volunteered that he did not believe

he cared to sentence anyone to death; that he would not like to see anyone killed; that he did not believe in the death penalty; that he did not go for it, or similar responses. Other jurors, in response to the scruples question answered with a simple affirmative and they were excused for cause. In at least 8 instances the prospective juror answered that he had no scruples against inflicting the death penalty but on further inquiry stated that he could not sign a death verdict. We believe that when the questions and answers are considered in the context of the entire *voir dire* examination, in which the prospective jurors were informed of the fact that the defendant was on trial for 8 separate crimes of murder, and in which they were advised that the State intended to ask that the death penalty be inflicted, an answer stating that the juror had scruples against inflicting the death penalty was equivalent to stating that he would not consider its imposition in the case which was before them. This conclusion is fortified by the responses of the 8 jurors previously referred to who stated that they had no scruples and yet stated that they would not impose the death penalty. If these jurors, in the context of the entire *voir dire* examination and in the circumstances of this extraordinary case, would not inflict the death penalty in spite of having no scruples against its imposition, it seems obvious that those jurors who said that they had scruples would, if questioned further, have stated that they would not inflict or consider inflicting the death penalty. We are aware that in *Witherspoon* the court stated that unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment, no matter what the trial might reveal, it cannot be assumed that that is his position. We are of the opinion that the situation here is so different from that in *Witherspoon* that this comment of the Supreme Court is not binding upon us. *Witherspoon* requires vacation of a death sentence only where jurors are excused because "without more" they say

that they are opposed to capital punishment. (*Bumper* v. *No. Carolina,* 391 U.S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788, 1790.) Here there was much more than a bald statement of opposition and we do not regard our interpretation of the jurors' responses as an assumption, but a well-founded conclusion based upon the record.

There is a further reason why *Witherspoon* does not, in our opinion, require vacation of the death sentence. The State and the defense do not agree as to exactly how many jurors were excluded because they stated they had scruples against the death penalty without stating they would automatically vote against it or would not consider imposing it, and our independent review of the record produces figures somewhat different from either those of the State or the defense. However, the exact number is not of controlling importance. Our examination shows that 82 prospective jurors were excused for reasons connected with opposition to the death penalty. Of these, including the 9 who volunteered the information, 27 were excused because they stated they would refuse to inflict the death penalty and 5 others stated that they did not believe they could be fair because the State was asking for the death penalty. Unquestionably, these jurors were properly excluded under *Witherspoon* standards. Many jurors, of course, were excused for hardship reasons, or because they had preconceived notions of guilt. Out of a panel of 595 there were 50 jurors who were excused because they stated that they had conscientious scruples concerning the death penalty without stating that they would never impose, or consider imposing it. This figure includes the 17 prospective jurors previously mentioned who volunteered the statements that they did not like to see anyone killed, *etc.*

Prior to trial it was agreed that each side would have 160 peremptory challenges. After the jury had been selected the State still had 79 peremptory challenges remaining. Even if we make the rather violent assumption that each

of the excused jurors, although opposed to capital punishment, would have stated on further examination that they would inflict or consider inflicting the death penalty if the evidence justified, *Witherspoon* does not require vacation of the death sentence. It is a fair assumption, and indeed almost a certainty, that if the court had ruled that these prospective jurors could not be challenged for cause because they had indicated a willingness to consider the death penalty, the prosecutor would have challenged them peremptorily because of their scruples. The net result would be a jury of the same composition as that which sat in judgment upon the defendant.

Whether one accused of crime has been afforded due process is not to be determined by inquiring as to whether certain formal language has been used; rather, the inquiry is whether the defendant has received a fair trial. We are satisfied that the court exerted every effort to insure the defendant's right to a trial by a fair jury, and we hold that the exclusion of certain jurors who stated that they had conscientious scruples against capital punishment did not deny the defendant a fair trial. See *State* v. *Mathis,* 52 N.J. 238, 245 A. 2d 20, 27.

Finally, as an alternative to the *Witherspoon* argument, defendant contends that this court should exercise its discretionary authority and vacate the death sentence and impose a sentence of a term of years. Defendant contends that the medical evidence established that defendant was a psychopath subject to impulsive rage reactions and was not completely responsible for his acts and that by reason of this mental condition it would be cruel and unusual punishment to inflict the death penalty upon the defendant. Insofar as this claim relates to defendant's responsibility for his actions, it seems to present the defense of insanity at the time of the crime, a defense which was not raised at the trial and which we will not consider. We find nothing in the medical evidence to justify reduction

in the sentence. The great weight of that evidence showed that the defendant was responsible for his behavior at the time of the crime and the fact that he had anti-social tendencies and was prone to acts of violence does not make the crime of which he was convicted less reprehensible.

Defendant also claims that we should reduce the sentence because the jury which imposed it was unfair. The defendant's argument concerning the fairness of the jury has previously been considered in connection with the argument that alleged prejudicial publicity prevented a fair trial and in connection with the *Witherspoon* argument.

We have fully considered the numerous contentions advanced by the defendant and are of the opinion that his guilt was established beyond a reasonable doubt and that he received a fair trial. The judgment of the circuit court of Peoria County is affirmed. The clerk of this court is directed to enter an order fixing Friday, January 31, 1969, as the date on which the original sentence of death entered in the circuit court shall be executed. A certified copy of this order shall be furnished by the clerk of this court to the warden of the Illinois State Penitentiary at Joliet.

*Judgment affirmed.*

Mr. JUSTICE WARD took no part in the consideration or decision of this case.