The People of the State of Illinois, Plaintiff-Appellee, *v.* Allen Clark (Impleaded), Defendant-Appellant.

(No. 57150;

First District—November 17, 1972.

*Rehearing denied December 14, 1972.*

Carl M. Walsh, of Chicago, for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Elmer C. Kissane and Stephen R. Kramer, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE DRUCKER delivered the opinion of the court:

In a bench trial the defendant, Allen Clark, was convicted of murder and sentenced to 25 to 40 years.[*]

On appeal the defendant contends that (1) three in-court identifications should have been suppressed as the fruit of an illegal arrest; (2) these in-court identifications should have been suppressed because they were tainted by pre-trial identification procedures which were unnecessarily suggestive and conducive to irreparable mistaken identification; (3) it was error to permit a State witness to testify as to a statement made by the defendant in the witness' presence because the State failed to give adequate notice of the statement as required by Section 114—10 of the Code of Criminal Procedure (Ill. Rev. Stat. 1969, ch. 38, par. 114—10); and (4) the evidence failed to establish guilt beyond a reasonable doubt.

The murder took place on the East 300 block of 51st Street, between Calumet Avenue and King Drive. On November 2, 1969, at about 3:50 A.M., the victim, James Allen Brown, was walking to his car. It was parked on the south side of the street, facing east. As he neared his car and entered it, a man with a gun approached him from behind. The man with the gun was later identified as the defendant. The gunman stood in the street near the driver's window. He was accompanied by one or two men who remained on the other side of the car, and slightly to the rear. After the victim entered his car, the gunman put his gun in the driver's window and said: "Don't move." At this moment the victim's car quickly pulled away. The gunman fired a shot, but the car continued east on 51st Street. The gunman fired again. This time the victim's car swerved across the westbound lane, jumped the curb and smashed into the wall of a

---

[*] The defendant was tried jointly with James Yates. At the close of the State's case a motion to dismiss Yates' case was granted.

building on the north side of 51st Street, almost at the intersection of 51st Street and King Drive. In all, the car had travelled about 150 feet. After the car came to rest, the assailants ran down the street, searched the interior of the car and removed the victim's wallet. They then retreated in the direction from which they had come along 51st Street. The cause of death was a bullet wound in the back of the head.

A hearing on a motion to suppress identification testimony was heard concurrently with the trial. Three occurrence witnesses made in-court identifications of the defendant. The first, Bernard Payne, testified that on November 2, 1969, at about 3:45 A.M. he and a friend were walking east on the north side of 51st Street. As he was walking, he heard footsteps behind him. As he turned around, the defendant, holding a gun, bumped into him and then stepped into 51st Street, headed for the victim. Payne testified that he was only able to see the defendant for "a second" when they bumped into each other. Payne remained on the sidewalk and watched the defendant follow the victim to his car. He saw the defendant put his gun in the victim's window after the victim had entered his car. Payne watched the defendant as he fired at the victim's fleeing car. After the victim's car crashed, the defendant turned and faced Payne, still holding the gun. They stared at one another for "about fifteen seconds." At this time they were separated by one-half the width of 51st Street. The street lights were on. Payne turned around and entered a nearby restaurant, and the defendant turned and headed towards the victim's smashed car. A moment later Payne stepped out of the restaurant and saw two men kneeling by the victim's auto, looking at what appeared to be a wallet.

About two and one-half weeks later Payne identified the defendant from a group of about 17 photographs. (All of the photographs were of male Negroes; the defendant is a Negro.)

On cross-examination Payne testified that prior to the shooting he and his friend had been at a tavern and then a restaurant. He stated that he did not drink because he was on medication but that his friend had been drinking. He further testified that he had met his friend in a tavern that night. He then changed his testimony and stated that his friend had picked him up at work that night at midnight and that then they had proceeded to the tavern. On redirect he stated that one or two of the photographs he was shown may have been of a white male, and possibly a female.

Walter Hoskins, who made the second in-court identification of the defendant, testified that as he was sitting in a restaurant on 51st Street that night, he heard three shots. He looked out the window and saw three

men running down 51st Street towards King Drive. The men ran down the middle of the street and crossed over to the victim's car which had come to rest on the north side of the street. When the men reached the car, they "squatted down," but he could not tell what they were doing. He saw the men leave the car and walk past him as he stood in the window.

The next day, Monday morning, Hoskins encountered two of the three men on 51st Street; defendant was one of the two men. He (the defendant) turned to his companion and stated: "That's the same fellow [referring to Hoskins] that was standing in that window that night." After his encounter with the defendant on the day after the shooting, Hoskins went to the police. He was taken to a police artist. He gave the artist a description of the defendant. He was shown the sketch after the police artist completed it. He identified the sketch in court.

Hoskins testified that about a week later Officer Ferguson drove him to a police station. While he was waiting in the police station, he saw the defendant walk past a doorway. He testified that Officer Ferguson was walking with the defendant but that no one had pointed out the defendant for him.

On cross-examination Hoskins testified that when Officer Ferguson drove him to the police station, Ferguson asked him if he (Hoskins) could identify the man he had seen. Hoskins answered that he could. Ferguson did not tell Hoskins that the defendant would be at the police station. Upon further cross-examination Hoskins testified that during World War II, while in the Armed Forces, he wore glasses for "weak eyes." He had stopped wearing the glasses, however, because they broke, and he never obtained replacements. His Illinois driver's license did not require him to wear glasses.

Hoskins also testified that prior to testifying, while waiting in the witness room, he had looked at two photographs that had been lying on a table in the room. He testified that one of the photographs was of the defendant.

The third occurrence witness who made an in-court identification of the defendant was Jerry Wilson. Wilson had disembarked from a C.T.A. bus just after the victim's car crashed. He saw the defendant going through the interior of the victim's car. Two other men were standing next to the car. The witness was on the opposite side of 51st Street as he passed the victim's car and observed the defendant. The witness kept walking until he reached the elevated station. He testified that he also saw the defendant about 45 minutes later. The witness had known the defendant for about a year and has seen the defendant on several occasions. The

witness stated that the police had shown him seven photographs on December 9, 1969. They were all of male Negroes, but the photographs, he testified, were not all of the same size.

On cross-examination the witness testified that he first contacted the police near the end of November after learning from a police officer the true nature (*i.e.* murder) of the incident. On December 9, when he was shown the photographs, he identified a photograph of the defendant and also the artist's sketch.

The arresting officer, Detective John Ferguson, was called by the defense on the motion to suppress and later by the State. He gave testimony concerning the circumstances of the defendant's arrest and the procedures used for the identifications by Hoskins and Payne.

As to the arrest, Ferguson testified that he already had a description of the defendant and a police artist's drawing of the defendant based on a description furnished by an occurrence witness when he received a tip that the person in the sketch would be in a certain tavern on November 10, 1969. The officer and his partner waited in the tavern all day. When the defendant walked into the tavern, Ferguson recognized him from the sketch. But Ferguson did not arrest the defendant immediately. He knew that there were two accomplices but did not have their descriptions. He and his partner decided that arresting the defendant immediately could alert any accomplices who might be in the company of the defendant. They elected to wait. Finally, the defendant began to create a disturbance. At this point the officers arrested the defendant for disorderly conduct believing that removing the defendant from the tavern under this charge would avoid the possibility of tipping off any of his accomplices. However, once the defendant was outside of the tavern, the officer told him that "he was under arrest, that we were taking him into the Area [investigative headquarters for surrounding police districts] for questioning in connection with a homicide." Defendant was advised of his rights before leaving the scene, and he indicated that he understood them. Later, at the station, the defendant was again advised of his rights, shown the sketch and told that it was made by a witness to the murder.

Officer Ferguson also testified as to the circumstances surrounding the out-of-court identifications by Hoskins and Payne. He testified that the defendant was identified by Hoskins at the police station during an inadvertent confrontation. Ferguson testified that the defendant had requested to be taken to the washroom. As Ferguson escorted the defendant down the hall towards the washroom, they passed a doorway in which Hoskins happened to be standing. At this time Hoskins identified the defendant as the man he had seen at the shooting. Ferguson testified that

he did not know that Hoskins would be able to see defendant as he walked down the hall past the doorway.

Ferguson testified that Payne identified the defendant from photographs. The group of photographs consisted of photos of 17 male Negroes. He testified that Payne had no difficulty in picking out the defendant's picture. The picture which Payne identified was the mug shot taken after the defendant's arrest.

The defendant offered four alibi witnesses and testified in his own behalf. He also offered two witnesses who had been near the scene of the shooting but who did not see the defendant at the scene.

As to the alibi witnesses, all four of them (Ethel Jones, Bessie Mae Williams, Virginia Knox and Charles Jones) could account for the defendant's whereabouts on November 1, 1969, from 2:30 P.M. to 9:00 P.M.; they were with the defendant at a tavern on the north side of Chicago. Three of the witnesses (Charles Jones, Bessie Mae Williams and Virginia Knox) and the defendant then left the tavern, stopped at a grocery store and proceeded to a north side apartment occupied by the defendant and two of the witnesses; they reached the apartment at about 9:30 or 10:00 P.M. At about 11:00 P.M. the defendant went to the nearby apartment of the fourth alibi witness, Charles Jones, where he allegedly spent the night. Jones testified that he saw the defendant before they retired for the night at about midnight and next heard him talking to his roommate the next morning at about 7:30 A.M. He further testified that because of an inside lock, a key was needed in order to get out of the apartment, and the key was removed at night by either himself or his roommate. But there was a second door to the apartment through which one could gain access to the outside. The defendant slept in a room by himself that night.

The defendant testified in his own behalf. In addition to corroborating the testimony of the four alibi witnesses, he also testified that he never left Charlie Jones' apartment on the night in question.

As to the two witnesses who were near the scene of the shooting, the first, Herman Walker, testified that he was in a newsstand to the west of the shooting, located on 51st Street under the elevated station. Walker sold a paper to the victim shortly before the shooting. But he further testified that the victim walked out of his line of vision after he sold him the paper. The second, Simon Lincoln, was at a newsstand on the corner of 51st Street and King Drive. He testified that he walked away from the stand after the victim's car crashed nearby, fearing an explosion.

*Opinion*

The defendant first contends that he was arrested without probable

cause and therefore the in-court identifications should have been suppressed as the fruit of an illegal arrest. Under this theory of the facts, he was arrested for disorderly conduct, and this arrest was a mere investigatory "sham" and without probable cause; that therefore the police station confrontation with the witness Hoskins, and the subsequent identifications by the other witnesses from a "mug shot" taken after this arrest, were the tainted fruit of the arrest.

■■ An officer is justified in making an arrest without a warrant when he reasonably believes that an offense has been committed and that the person whom he seeks to arrest is the offender. (Ill. Rev. Stat. 1967, ch. 38, par. 107—2(c); *People v. Wilson,* 45 Ill.2d 581, 585, 262 N.E.2d 441.) Officer Ferguson testified that the defendant had created a disturbance of some sort as well as using insulting language. Information used by an officer in determining the existence of probable cause does not have to meet the same burden needed to obtain a conviction for the offense. (*People v. Marino,* 44 Ill.2d 562, 573, 256 N.E.2d 770.) Therefore, the court could properly find that there was proper probable cause for defendant's arrest. Under the evidence the court could have concluded that the defendant was really arrested for his involvement in the murder because of the following facts: Officer Ferguson was in the tavern due to a "tip" that the person who was the subject of the police artist's sketch was going to be there on this particular day; Ferguson recognized defendant as the person in the sketch; the arrest for disorderly conduct was for the purpose of preventing any of defendant's accomplices· to the murder who might have been present from knowing the true nature of the arrest (*i.e.* for murder); once the defendant was taken outside the tavern he was immediately told that he was being taken to the police station regarding a homicide; and the officers gave defendant the *Miranda* warnings at this time.

The cases cited by defendant in support of his argument that his arrest, if for disorderly conduct, was illegal, are inapposite. *Cohen v. California,* 403 U.S. 15, held that under the circumstances of that case, the mere use of obscene language would not provide a valid basis for an arrest for disorderly conduct. But in the instant case there was a disturbance as well as the use of insulting language. *Gooding v. Wilson,* 405 U.S. 518, was reversed because the particular Georgia statute under which defendant was arrested was unconstitutionally vague and broad.

■■ The defendant next contends that the pre-trial identifications by Hoskins, Payne and Wilson were so unnecessarily suggestive as to deny him due process of law and that the in-court identifications should therefore have been suppressed. He cites *People v. Blumenshine,* 42 Ill.2d 508, 250 N.E.2d 152, and *People v. Lee,* 44 Ill.2d 161, 254 N.E.2d 469.

However we need not consider the degree of suggestiveness or lack of necessity for the pre-trial identification procedures used since it is well established that even if the suggestiveness and lack of necessity is demonstrated, an in-court identification will still be admitted where there is clear and convincing evidence that it is of an independent origin arising from an earlier uninfluenced observation of the defendant. *People v. Cook,* 113 Ill.App.2d 231, 236, 252 N.E.2d 29.

As to Bernard Payne, he saw the defendant when the latter bumped into him while walking on 51st Street. Payne continued to watch the defendant throughout the shooting from a distance of one-half the width of the street. When the victim's car crashed, the defendant turned and stared directly at Payne for about 15 seconds. Payne also saw the defendant's face as the defendant walked back from the victim's car. This time he passed within one foot of the witness. As to Hoskins, he observed the defendant as the defendant ran down the street towards the victim's car. He also saw the defendant as he walked back from the victim's car. He encountered the defendant again the following morning. Hoskins was able to provide a police artist with a description of the defendant. The resulting sketch led to the defendant's arrest. As to Wilson, he was able to observe the defendant searching the victim's car. They were separated only by the width of 51st Street. The street lights were on. He was able to watch the defendant while walking from King Drive to the elevated station. He saw the defendant again about 45 minutes later. Furthermore, Wilson had known the defendant for about a year prior to the incident. (See *People v. Robinson,* 42 Ill.2d 371, 375, 247 N.E.2d 898.) He had implicated the defendant before having to look at the photographs.

■■ We find that there was clear and convincing evidence of previous, uninfluenced observations of the defendant to support the in-court identifications and that the motion to suppress was properly denied.

The third contention of the defendant is that it was error to allow Hoskins to testify as to an oral statement made by the defendant when Hoskins encountered him on 51st Street the day after the murder. Hoskins testified that when he encountered the defendant, the latter turned to his companion and stated: "That's the man that was in that window that night." The defendant argues that it was error to allow this testimony because the State failed to comply with the notice requirements of Section 114—10 of the Code of Criminal Procedure. (Ill. Rev. Stat. 1969, ch. 38, par. 114—20.) Subparagraph (a) of the Section states:

> "(a) On motion of a defendant in any criminal case made prior to trial the court shall order the State to furnish the defendant with a copy of any written confession made to any law enforce-

ment officer of this State or any other State and a list of the witnesses to its making and acknowledgment. If the defendant has made an oral confession a list of the witnesses to its making shall be furnished."

■■ Without deciding whether or not the alleged remark amounted to a confession, we note only that it was not made to a law enforcement officer. Therefore, the defendant's argument is without merit. *People v. Durham*, 131 Ill.App.2d 1033, 269 N.E.2d 348.

Defendant's final contention is that he was not proven guilty beyond a reasonable doubt because of the weakness of the identification testimony, the persuasiveness of his alibi and the testimony of two men who were near the scene of the shooting but did not see defendant.

In answering the first two contentions we stated the following in *People v. Cook, supra*, at page 241, where we addressed ourselves to a similar argument:

"It is true that where a conviction rests upon an identification which is doubtful, vague, and uncertain, it will be reversed. [Citations omitted.] This is ultimately a question for the trier of fact, however, whose duty it is to consider contradictory testimony, and to determine the credibility of the witnesses, and the weight to be given their evidence. [Citations omitted.]"

■■ We have considered the identification testimony already. We disagree with the defendant's contention that it is too weak to support a conviction.

As for the defendant's alibi, any reasonable doubt created by it would depend on the weight given to the contradictory evidence of the defendant and the State. This also is a question for the trier of fact. The trial court evidently did not believe the alibi evidence, and we find no basis for disturbing its conclusion. We note that even if the alibi witnesses' testimony were to be believed, it still permitted the trier of fact to conclude that the defendant was at the scene of the murder. Charles Jones, whose apartment defendant allegedly slept in on the night in question, stated that he fell asleep at about midnight, that defendant slept in a room by himself, and that there was a door through which access to the outside could be attained. Only the defendant's own testimony placed him (with certainty) away from the scene of the crime at the relevant time.

The fact that two men near the scene of the crime (Simon Lincoln and Herman Walker) did not see the defendant is not persuasive as to defendant's innocence since their testimony, even if believed, did not preclude the trier of fact from concluding that the defendant was at the

scene of the murder. These men simply may not have seen the defendant at the relevant time from the positions at which they were located.

For the foregoing reasons the judgment is affirmed.

Judgment affirmed.

LORENZ, P. J., and ENGLISH, J., concur.

