THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROBERT JILES Defendant-Appellant.

(No. 57288; )

First District (5th Division)—July 6, 1973.

Leonard Karlin, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago, for the People.

Mr. JUSTICE SULLIVAN delivered the opinion of the court:

After a jury trial, defendant was found guilty of the charges of attempt (armed robbery) by threatening Gerald Kirk with a dangerous weapon (Ill. Rev. Stat. 1969, ch. 38, par. 8—4), aggravated battery, in that he committed a battery which caused great bodily harm (Ill. Rev. Stat. 1969, ch. 38, par. 12—4(a)), a second count of aggravated battery, in that he committed a battery causing permanent disfigurement (Ill. Rev. Stat. 1969, ch. 38, par. 12—4(a)), and a third count of aggravated battery, in that he committed a battery while armed with a deadly weapon (Ill. Rev. Stat. 1969, ch. 38, par. 12—4(b—1)). He was sentenced to serve three to seven years for the offense of attempt (armed robbery), three to seven years for aggravated battery causing great bodily harm, three to seven years for aggravated battery causing permanent disfigurement, and one to three years for aggravated battery while armed with a deadly weapon, all sentences to run concurrently.

On appeal defendant argues that he was denied due process of law because Kirk's pretrial identifications of him were legally objectionable and that he was not given a fair trial.

On May 14, 1970, at approximately 5:30 P.M., on a sunny afternoon, Gerald Kirk was driving a Jewel Foods truck westward on the Eisenhower Expressway. He heard some noise coming from his truck and he pulled off to the side of the expressway at the California Avenue exit (2800 West). When he stopped, a wheel rolled off his truck. It was too heavy for him to handle and he left to obtain help. He walked up an embankment, climbed a fence separating the expressway from Van Buren Street, and crossed over to the sidewalk on the north side of that street where he noticed four black men standing in front of a building situated close to the sidewalk. He observed that one of the four was eyeing him very intently. Kirk walked past the four men on his way to a gas station and as he reached the corner of Washtenaw and Van Buren he heard a noise behind him. When he turned around a man with a knife in his hand grabbed his arm and asked for money. He was later identified by Kirk as Robert Jiles, the same man who had eyed him earlier. A forty-five second to a minute, face-to-face, struggle followed during which time Kirk's left ear was cut by the assailant's knife. Kirk broke loose, and ran westward to a Shell gas station at Sacramento

Avenue (3000 West) and Van Buren where he held a towel to his bleeding ear, and telephoned the police and his employer. Two or three minutes later a squad car driven by Sergeant Sullivan arrived, followed closely by officers Ross and Randle in another police vehicle. Kirk drove with Sullivan to look for his assailant and also gave him the following detailed description of his assailant: young, black man, 5'5" tall, 190 pounds, beard, moustache, afro-style haircut, black ¾ length leather type jacket, green pants and a sort of khaki type shirt. Sullivan radioed this information to Ross and Randle. At the intersection of Washtenaw and Van Buren (where the attack had occurred) Kirk saw a young black man, about ¼ of a block north on Washtenaw getting into a car and told Sullivan, "That's the man." This was approximately fifteen minutes after the attack took place. At about the same time Ross and Randle observed the same young man and, because he resembled the person described, they began following the car. The two police vehicles curbed the car and Kirk identified the young man as his assailant. He was placed under arrest by Ross, and when searched a knife was found in one of his pockets.

Kirk was taken to the emergency room of Garfield Park Hospital. At about the same time a paddy wagon, that had been at the scene of the arrest, transported the now handcuffed defendant to the Garfield Park Hospital where he was taken to the emergency room and again identified by Kirk who, at the time, was having his ear stitched. Ultimately, reconstructive surgery, necessitating two operations, was required to repair the damage to Kirk's ear. After receiving treatment Kirk went to the Fillmore District Police Station accompanied by a Jewel supervisor to sign an arrest slip. At the station he identified, at the request of Detective Thomas, both the knife recovered at the scene of the arrest and defendant who at that time was in a small interrogation room with Sergeant Sullivan and other plain-clothes policemen, but without handcuffs.

Defendant testified that he spent most of that day at his mother's house, 2618 West Gladys, leaving at approximately 5:55 P.M. He also stated that there was no knife in the interrogation room of the police station when he was viewed by Kirk and that the knife identified in court as the weapon of the assailant wasn't the same knife taken from him during the search.

Arlene Washington, defendant's sister, testified that defendant and some friends spent most of the day at 2618 West Gladys and he left at around 5:55 P.M.

*OPINION*

Defendant first contends that the pretrial identifications at the hospital

and police station were so fundamentally unfair and conducive to irreparable mistaken identification that he was deprived of due process of law. He argues that these confrontations tainted the identification testimony of Kirk to the extent that his in-court identification should not have been admitted into evidence.

■■ We believe that the hospital and police station identifications were justified under the circumstances, but that regardless of this evidence his identification testimony at trial was admissible on the ground that it had prior independent origin because Kirk had adequate opportunity to observe defendant at the time of commission of the crime. (*People v. Cook* (1969), 113 Ill.App.2d 231, 252 N.E.2d 29.) Kirk saw defendant on the porch as he passed and had an excellent opportunity to observe him during their forty-five second to a minute, face-to-face struggle, on a sunny afternoon. He also gave a detailed description of his assailant immediately after the incident which enabled officers Ross and Randle to recognize the defendant, and a positive identification was made by Kirk at the time of defendant's arrest, about 15 minutes after the incident. We noted nothing in the record to indicate that the police officers in any way improperly induced Kirk to make this identification.

■■ It is well established that even if suggestiveness and lack of necessity is demonstrated, an in-court identification will still be admitted where there is clear and convincing evidence that it has an independent origin arising from an earlier uninfluenced observation of the defendant. *People v. Clark* (1972), 8 Ill.App.3d 700, 291 N.E.2d 33.

We conclude that the identification proceedings here were not so conducive to irreparable mistaken identity that defendant was denied due process of law.

Defendant also maintains that on *voir dire* examination the trial court afforded more latitude to the prosecution than to the defense and so regularly upheld objections of the State and overruled those of the defense to the extent that defendant was prejudiced and deprived of a fair trial. No specific references to particular conduct or rulings were made but we have examined the record and are of the opinion that the interrogation of jurors was fairly conducted and, in particular, that the defense was provided more than a reasonable opportunity for a full and complete interrogation.

■■ Defendant also argues that he was prejudiced by certain failures of the police to maintain and produce material records, specifically, (1) that the erasure of police radio tapes prevented the defendant from using them to possibly show that the complaining witness had not seen him before his arrest, (2) that a police crime laboratory report, which was negative as to finger prints or blood stains, was not

produced at trial, and (3) that the exclusion of certain photographs of the vicinity of the crime prevented the defense from establishing that the attack did not occur where testified to by the complaining witness. We note that there was testimony that police tapes were regularly erased after 30 days for reuse and inasmuch as defendant wanted the tapes only for possible impeachment of the officers and because there is no indication that the tapes were erased to avoid their production in this trial or that they might have had some impeachment value, we do not believe defendant was prejudiced. The record also indicates that the crime lab never provided the police department a report of its examination of the knife, if any was in fact made, and in any event counsel for defendant brought out the testimony that there was no indication of blood on the knife and therefore we see no prejudice to defendant by reason of the fact that a crime laboratory report analysing the knife was not produced in court. In his complaint concerning the refusal of certain photographs defendant contends he was denied due process because he was prevented from establishing a phase of his defense intended to show that Kirk was unsure of the place where he parked the truck which, he contends, could have led the jury to conclude that Kirk erred in his recollection of other aspects of his testimony. We note that the trial judge inspected each one of the photographs and informed defendant's attorney that he could choose any photograph from each group and it would be admitted by the court but that he would refuse other photographs unless they could be justified for other reasons, following which there was a hearing as to admissibility of each photograph with 8 of 19 being admitted. Defendant made no offer of proof as to other 11, nor does he otherwise point out how he was prejudiced by the refusal of any one of the photographs.

■■ The purpose of review in a criminal case is not to determine, whether the record is perfect, but whether the defendant had a fair trial under the law and whether his conviction is based upon evidence which establishes his guilt beyond a reasonable doubt. (*People v. Dickman* (1969), 117 Ill.App.2d 436, 253 N.E.2d 546.) We conclude here that the conviction of defendant was upon evidence that did establish his guilt beyond a reasonable doubt.

■■ Defendant was convicted of attempt (armed robbery) and of three counts of aggravated battery and sentenced to specific terms on each to run concurrently. In *People v. Baker* (1969), 114 Ill.App.2d 450, 453-457, 252 N.E.2d 693, this court gave a thorough discussion delineating the propriety of concurrent sentencing and, although this point was not raised on appeal, we have examined the record to determine whether the conduct of the defendant, constituting attempt

(armed robbery) and three counts of aggravated battery, arose out of the same occurrence at the same time and place, so that, under Ill. Rev. Stat. 1971, ch. 38, par. 1—7(m), there should be but one sentence for the legally greater of the offenses as discerned by comparing the maximum statutorily authorized punishment for each of the two crimes. (*People v. Gaines*, 11 Ill.App.3d 14, 295 N.E.2d 560.) Here, the defendant's acts constituting the offense of aggravated battery were not independently motivated or otherwise separable from the offense of attempt (armed robbery) and it was therefore improper for defendant to be sentenced on any count of aggravated battery, it being a lesser offense than attempt (armed robbery). *People v. Miller* (1971), 2 Ill.App.3d 206, 276 N.E.2d 395; *People v. Thompson* (1972), 3 Ill.App.3d 684, 278 N.E.2d 1.

■■ The judgments as to all four crimes charged are affirmed. The sentence for the crime of attempt (armed robbery) is also affirmed, but the sentences for the three offenses of aggravated battery are vacated.

Affirmed, sentences vacated in part.

DRUCKER, P. J., and ENGLISH, J., concur.