(No. 40966.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* WILLIAM LEE, Appellant.

*Opinion filed Dec. 19, 1969.—Rehearing denied Jan. 26, 1970.*

WARD, J., took no part.

LOUIS M. LEIDER, of Chicago, (BRIAN L. CROWE and THOMAS M. HOGAN, of counsel,) for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago, (JAMES B. ZAGEL, Assistant Attorney General, and ELMER C. KISSANE and MICHAEL D. STEVENSON, Assistant State's Attorneys, of counsel,) for appellee.

Mr. CHIEF JUSTICE UNDERWOOD delivered the opinion of the court:

William Lee appeals from his conviction of murder and sentence of death imposed by the circuit court of Cook County following a May, 1967, jury trial.

On January 13, 1966, about 2:00 P.M., four men and two women were in the wholesale grocery store known as J. P. Graziano, Inc. at 901 West Randolph Street, Chicago, Illinois. Those present were the then 76-year-old owner of the business, James Graziano, his son, Fred Graziano, age 52, a friend of James Graziano, Tony Genna, and the deceased, Gaetano Pampinella, a salesman for the firm. Also present were Angeline Aliosio and Margaret Incavo, two clerical employees. There was a large office in the middle of the store and a smaller office to the west of the larger one.

The various individuals were going about their business when they were startled by a loud blast. The deceased who had been standing just inside the large office with his back to the door fell forward, shot in the back with a shotgun. It was established at trial that death was a direct result of these gunshot wounds.

Fred Graziano testified that at the time of the shooting he had been punching checks inside the large office. After the shot, he observed two colored men inside the store. One, referred to as "the tall guy", entered the office, grabbed Tony Genna, and forced him into the smaller office. The other, referred to as "the little guy", then entered the large

office and, as James Graziano bent down attempting to help the deceased, put his hands in decedent's pockets and pulled out money. This robber then ordered "everyone down" and, after the witness pointed out the cash drawer, proceeded to it and scooped up more money. The total amount taken was said to be about $300.

Fred Graziano described "the tall guy" as carrying a sawed-off shotgun, wearing a three-quarter length dirty tan coat, hatless, light-complected and very tall—about six feet, four inches. During the 5 or 10 minutes the tall man was in the well-lighted store his face was uncovered and this witness was able to see his face clearly.

The testimony of the two female employees, Angeline Aliosio and Margaret Incavo, was substantially the same as that of Fred Graziano, except that neither woman could identify the defendant although the former testified the assailant was colored and very tall. They testified that soon after the shot they stooped behind their desks. Tony Genna was also unable to identify the defendant. Like Mrs. Aliosio, this witness could testify only that the assailant was a Negro and very tall.

Chicago Police Officer Neil Francis testified that his assignment was to walk the Randolph Market beat from 6:00 A.M. to 2:30 P.M. About 2:00 P.M. the witness, a policeman for 13 years, was entering the store as "the tall guy" and his accomplice were leaving in a rush. The apparently vacant store caused the officer to be immediately suspicious and he began to unbutton his jacket. Fred Graziano then said there had been a robbery and shooting. The officer saw the fallen Pampinella, pulled his gun and ran out of the building to the corner of Peoria and Randolph streets, where he saw a car facing south and pulling away from the curb. From a distance of 20 feet he fired three shots at the driver. The tall man was described by Officer Francis as wearing a dirty tan topcoat and no hat.

At about 2:00 P.M. on the same day Officer Ralph

Varchetto found, four blocks south of Graziano's market, a light tan Ford with three bullet holes in the back. This car had struck another car and been abandoned by its occupants. Subsequently it was discovered that this vehicle had been stolen earlier that day. A shotgun found in this car was introduced in evidence.

Ray Nault, a truck driver, testified that he saw, from a distance of 10 feet, 3 colored men leave the Ford and "gallop" down the street following the car accident. He described the men as one tall and two of medium height, wearing black leather jackets and all bareheaded.

About the same time, 3 colored men engaged a cab in the vicinity of Sangamon and Jackson Boulevard, about 4 blocks from the accident, and were driven to an address on Hamlin Avenue between Washington and Lake Streets. The cab driver said that one of the men was tall and paid the fare. Neither the truck driver nor cab driver identified defendant as one of these men. A few days later the police arrested Lawrence Anderson who implicated the defendant. The defendant was arrested on January 25.

Defendant contends he was entitled to discharge for failure of the State to provide him a speedy trial within the statutory 120-day rule. (Ill. Rev. Stat. 1965, ch. 38, par. 103—5.) He was not admitted to bail following his arrest, and indictment No. 66—752 was returned against defendant and Lawrence Anderson March 4, 1966. On April 19, 1966, defendant's motion for a severance from Anderson was granted. Indictment No. 66-1902 which added defendant Gerald Washington was returned June 15, 1966. On June 22, 1966, the State moved to dismiss No. 66-752. While defendant was eventually re-indicted a second time and not tried until May 10, 1967, the only issue, as we understand the argument, is confined to the period prior to June 22. Defendant's motion for discharge was filed August 11, 1966. In it he alleged that all delays caused by him under the dismissed indictment (No. 66-752) were removed and elimi-

nated from consideration to the same degree as the indictment itself, and therefore no delay attributable to him intervened between January 26 and June 22 to toll the running of the statute.

Apparently this novel claim has never been directly passed upon by this court. However, as early as *Brooks* v. *People*, 88 Ill. 327, 330, this court held that where an original indictment is dismissed and defendant is re-indicted for the same offense the statutory period continues to run "as if there had been no dismissal of the first indictment", or as if the indictment under which defendant is tried had been the first indictment returned. The substance of that holding was that re-indictment for the same offense does not toll the statute. Subsequent cases have repeated this rule (*People* v. *Hamby*, 27 Ill.2d 493, 496; *People* v. *Witt*, 333 Ill. 258, 263), although the later cases have noted that motions to test the validity of an indictment and the delay occasioned thereby can be charged to the defendant. *Hamby* at 496.

Re-indictment following the dismissal of a prior indictment on the same offense, although in form a new crime, in substance continues to represent the State's original charge against the individual. Logic and fairness require that dismissal of the first indictment not operate to erase for purposes of the statute the delays caused by the defendant under that indictment.

A delay charged to the defendant tolls the running of the statutory period which then starts anew from the date to which defendant has caused the delay. These computations are not affected by the dismissal of the original indictment and re-indictment on the same offense.

In this case the period first began to run on January 25, 1966. The defendant's request for a severance was granted April 19, tolling the original period and starting a new period. This second period was not tolled by the re-indictment for the same offense on June 15, nor did the dismissal

of the first indictment (66-752) erase the delay caused by the April 19 severance. The motion for discharge was properly denied.

It was stipulated by the State that, following his arrest and during the hours that defendant was in the immediate custody of the police, he asked for and was denied the services of a lawyer. Actually, defendant had no counsel until March 11, 1966, when the public defender was appointed for him. It was during this period that the police arranged identification procedures which defendant argues were so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny him due process of law.

The first of these occurred January 26 when defendant was being held in a cell adjacent to and behind the felony courtroom at 2600 South California awaiting preliminary hearing. Officer Neil Francis testified that this cell, referred to as a bullpen, was about 10 feet wide and 15 feet long, and it was then occupied by about 25 men including both Caucasians and Negroes. Officer Francis said he walked back to the restricted area of the bullpen and that when he saw the defendant he pointed and said: "William Lee, come here." Then the officer asked: "Have you ever seen me before?" The defendant said nothing and walked away.

The second confrontation which defendant complains of occurred March 1, 1966, at a coroner's inquest as to the cause of decedent's death. Fred Graziano testified that prior to the inquest he received a phone call from the Chicago Police Department and was told he should come to the coroner's inquest because the police "had the guys that did it, come on down and identify them." He informed his father of this communication and they both appeared at the inquest. While they waited in the hearing room the defendant was brought in handcuffed to Lawrence Anderson, a man whom both had previously identified in a lineup as the "short guy". Both Grazianos saw the defendant handcuffed to Anderson.

Prior to the trial defense counsel filed a motion pursuant to *Wade* v. *United States* (5th cir., 1966), 358 F.2d 557, to suppress the in-court identification of the 3 witnesses—Officer Neil Francis, James Graziano and Fred Graziano. After a stipulation between the State and defense counsel which in effect agreed to the above statement of facts, the trial court denied the motion. All three of the witnesses made in-court identifications of defendant at trial. Apart from this identification testimony, no substantial evidence was presented by the State to connect the defendant with the offense.

Recent decisions of this court have recognized that *Stovall* v. *Denno*, 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967, established that where a pretrial identification proceeding occurred on or before June 12, 1967, an unrepresented defendant is free to establish, based on the totality of the surrounding circumstances, that the viewing of the accused was so wanting in fairness as to deprive him of due process of law. We have held that a defendant so claiming must prove that the confrontation conducted was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law. (*People* v. *Blumenshine*, 42 Ill.2d 508; *People* v. *Nelson*, 40 Ill.2d 146, 150.) In *Blumenshine* we specifically noted that, if the accused can support this claim the evidence of identification is rendered inadmissible and not, as was the case under prior Illinois law, simply affected as to credibility. 42 Ill.2d at 511; see *Foster* v. *California* (1969), 394 U.S. 440, 22 L. Ed. 2d 402, 89 S. Ct. 1127, n. 2.

The defendant contends that the circumstances of the confrontation at the inquest, where he was seen handcuffed to a previously identified participant in the crime, were "inherently tainted with unfair suggestion." There is a dangerous degree of suggestion by association where a suspected accomplice is viewed together with a person previously identified by the viewers as a perpetrator of the crime.

(See *People* v. *Blumenshine,* 42 Ill.2d at 512.) This suggestive influence was even greater here where the confrontation was preceded by the remarks of the police to Fred Graziano and related by him to his father.

The test is whether the identification procedures were "unnecessarily" suggestive and the methods used must be examined in light of the circumstances in each case. In *Stovall* v. *Denno,* 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967, the police conducted an admittedly suggestive show-up before the only eyewitness, the seriously wounded victim whose survival was uncertain. This confrontation was held not unnecessarily suggestive but "imperative". (388 U.S. at 302, 18 L. Ed. 2d at 1206, 87 S. Ct. at 1972.) However, there were no such circumstances compelling use of the procedures employed here. The defendant had been arrested and in custody for more than a month prior to the coroner's inquest. No reason is offered why the defendant was not viewed in a properly conducted lineup at an earlier date nor are there circumstances to be found justifying the unusually suggestive viewing conducted at the inquest.

The State urges that the record contains enough evidence to show that the witnesses in-court identifications of defendant were based on observation independent of and uninfluenced by the improper identification confrontation. (*People* v. *Nelson,* 40 Ill.2d 146.) We cannot agree. There is testimony by Fred Graziano relating to identification of defendant's picture from a group of pictures prior to the inquest. Some of his responses to defense counsel's questions would indicate he did not view the pictures before the inquest, in other responses he stated he could not remember whether it was before or after, and in response to the prosecution's questions he indicated it was before the inquest. In short, his testimony was conflicting and inconclusive. Even if it were clear that he had viewed the pictures prior to the lineup, we are not prepared to say that this would have been conclusive that his in-court identification was independent of and unin-

fluenced by the viewing at the inquest. The record contains no evidence which would indicate that James Graziano's in-court identification (weak at best) was uninfluenced by the suggestive confrontation at the inquest.

Contrary to the contention of the State, this case is unlike *Nelson,* where we found that the witnesses' in-court identifications were based on observations independent of and uninfluenced by the improper identification procedures. It is, however, quite similar to *Blumenshine* where the record did not permit an "informed judgment" on the question, and we believe *Blumenshine* conclusive on the identification issue here.

We accordingly vacate the judgment of conviction pending a hearing in the trial court at which the State will be given the opportunity to establish by clear and convincing evidence that each witness' identification had an origin independent of the unnecessarily suggestive confrontation at the coroner's inquest. A number of the factors which the trial court may consider in resolving this question are set out in *Blumenshine,* 42 Ill.2d at 514.

However, because the trial court may reinstate the conviction without a new trial, we must consider the remaining points raised by defendant. He argues that the trial court erred in preventing counsel from effectively stipulating as to the testimony of the pathologist, Dr. John V. Belmonte, respecting the cause of death. The record indicates the defendant's willingness to stipulate, and, apparently, the State's willingness to agree, although a doctor had been called and was present to testify because of the State's earlier understanding that no stipulation would be agreed to by defendant. Apparently because the court suggested the doctor might feel his time had been wasted if he was not called as a witness, the assistant State's Attorney refused to stipulate and proceeded with the doctor's testimony. While we agree that the court should not have discouraged the stipulation, we cannot agree that its refusal was reversible error under our

prior decisions. *People* v. *Speck,* 41 Ill.2d 177, 202 and cases therein cited.

The defendant also complains of the fact that the deceased's son testified that he was a dental student working part time in a bakery and the other survivors of the decedent were the witness's mother, a sister and a brother. As we stated in *People* v. *Bernette,* 30 Ill.2d 359, 371 : "A defendant's guilt must be established by legal and competent evidence, uninfluenced by bias or prejudice raised by irrelevant ·evidence and, in such connection, this court has consistently condemned the admission of evidence that the deceased left a spouse and a family, inasmuch as such evidence has no relationship to the guilt or innocence of the accused or the punishment to be inflicted upon him, but serves ordinarily only to prejudice him in the eyes of the jury. (*Filippo* v. *People,* 224 Ill. 212, 217; *People* v. *McMahon,* 244 Ill. 45; *People* v. *Gormach,* 302 Ill. 332; *People* v. *Jackymiak,* 381 Ill. 528; *People* v. *Dukes,* 12 Ill.2d 334.)" In this case, however, the defense failed to object to the testimony. Sound judicial administration requires that unless the error is so prejudicial as to deny the defendant a fair trial (*Bernette*), it must be objected to at the trial level where it can be excluded, if necessary, or restricted within proper limits. The testimony complained of here was not so prejudicial in nature as to require reversal. *People* v. *Speck,* 41 Ill.2d 177, 202; *People* v. *Jordan,* 38 Ill.2d 83, 91-92; *People* v. *Golson,* 32 Ill.2d 398, 409-410.

The defendant claims that he was denied his right to an impartial jury in violation of the sixth and fourteenth amendments to the constitution of the United States because all jurors who expressed general objections to or religious scruples against capital punishment were excluded. Defendant relies upon the United States Supreme Court opinion in *Witherspoon* v. *Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770.

The factual summary of the *voir dire* examination is as

follows: Eighty-four veniremen were examined in this case and ultimately a jury and two alternates were chosen. Thirty-five prospective jurors were excused for cause following their responses to questions relating to their objections to the death penalty.

The record reveals that 21 prospective jurors were excused for cause immediately after they affirmatively answered a question similar to the following: "Do you have any personal, religious or conscientious objections to the death penalty?" Twelve were excused after an affirmative response to a question similar to the following: "Do you have any personal, religious or conscientious objections to the death penalty in the proper case?" In an unresponsive answer one of the two other prospective jurors volunteered his opposition to the death penalty and was then asked: "You wouldn't want to give the death penalty, would you?" He answered, "No sir." The court on its own motion excused him for cause. The other prospective juror responded to the first form of the "scruples" question above with, "I don't think I could." She was then asked, "You don't think that you would give the death penalty" and answered, "That's right." The juror was excused for cause. We do not determine whether through their examination these two prospective jurors "made unmistakably clear  *  *  *  that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them." (*Witherspoon* v. *Illinois* (1968), 391 U.S. 510, 522, 20 L. Ed. 2d 776, 785, n. 21, 88 S. Ct. 1770, 1777, for it is clear that the sentence of death imposed here upon the defendant cannot be carried out since the jury that recommended it was chosen by excluding approximately one half of the venire for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. (*Witherspoon* v. *Illinois,* 391 U.S. at 522.) This is in sharp contrast to the

situation prevailing in *People* v. *Speck,* 41 Ill.2d 177, wherein we affirmed a death sentence in which it was argued that *Witherspoon* required its vacation. In *Speck* (41 Ill.2d at 212-213) we noted that "Witherspoon requires vacation of a death sentence only where jurors are excused because 'without more' they say that they are opposed to capital punishment. (*Bumper* v. *No. Carolina,* 391 U.S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788, 1790.)" and held the circumstances in *Speck* so dissimilar to *Witherspoon* that affirmance in *Speck* was not impermissible. In the case now before us, however, nearly 50% of the jurors excused for cause had indicated nothing "more", and we believe the circumstances here so different from *Speck* and so closely akin to *Witherspoon* that the death sentence cannot stand.

Accordingly, if on remand of this case the conviction is sustained, the trial court must resentence the defendant to a penalty other than death.

The judgment of the circuit court of Cook County is vacated and the cause is remanded for further proceedings in accordance with the views expressed herein.

*Judgment vacated and cause remanded with directions.*

Mr. JUSTICE WARD took no part in the consideration or decision of this case.