People of the State of Illinois, Plaintiff-Appellee, v. Lawrence Anderson, Defendant-Appellant.

Gen. No. 52,673.

First District, Second Division.

March 10, 1970.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Professor James R. Thompson, Northwestern University School of Law, of Evanston, Theodore A. Gottfried and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Thomas M. Walsh, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE BURKE delivered the opinion of the court.

Defendant was found guilty by a jury of the crime of murder and was sentenced to a term of 35 years to 50 years in the penitentiary. On appeal he contends that certain identification testimony was improperly ad-

mitted into evidence and that he was denied the right to elicit the address of a witness for the People on cross-examination. (William Lee and Gerald Washington were indicted with Anderson for the murder. Severances were allowed and each man was tried separately.)

At approximately 2:00 p. m. on January 13, 1966, Gaetano Pampinella was shot to death during an armed robbery of a wholesale grocery store located at 901 West Randolph Street in Chicago. The two robbers were armed with a pistol and a sawed-off shotgun, and escaped the scene in an automobile driven by a third man. A week later Anderson was arrested and charged with participation in the crimes.

Defendant filed a pretrial motion to suppress the identification testimony of two witnesses for the People, Chicago Police Officer Neil Francis who observed the assailants leaving the premises after the incident, and Fred Graziano who was the owner of and present in the store at the time of the incident.

At the hearing on the motion to suppress the testimony, defendant testified that he was arrested on January 20, 1966, as he and two companions were leaving a pool hall on West Madison Street in Chicago. He testified that they were taken to the Maxwell Street police station. He was placed in an interrogation room and threatened, beaten, tortured and interrogated by police officers for about fourteen hours. He stated that he was not advised of his constitutional rights, nor was he allowed to use the telephone. Defendant testified that about two and one-half hours after he was taken into custody, Officer Francis entered the interrogation room and conversed with him for fifteen to twenty minutes.

Defendant further testified that he was shown in a lineup during the fourteen-hour period and that there were three other men in the lineup beside himself, all of whom were darker complexioned and taller than the

315

defendant. After the lineup had been concluded, an officer informed defendant that he had been identified in connection with the murder, after which the police again beat him.

On cross-examination, defendant testified that the only other time he was shown in anything approaching a lineup was when a man was brought into the interrogation room. The man was unable to identify the defendant and was cursed by a police officer in attendance, who stated that the man was mistaken because defendant was the guilty party. Defendant also testified that he had an infection on his right wrist at the time of his arrest which resulted from a burn. He further stated that Officer Francis inspected the wound at the time they conversed in the interrogation room and stated to another officer present that defendant had not been shot. (This statement apparently related to the theory of the police that defendant had been struck by one of the bullets fired by Officer Francis at the automobile fleeing the murder scene.) Defendant further stated that during the entire fourteen-hour interrogation period he was not questioned about any matter other than the robbery and murder in question.

Officer James Burns testified that he and his partner arrested the defendant on January 20, 1966, pursuant to a communication from another branch of the police department. Defendant was transported to the police station where he was placed in an interrogation room. The officer testified that Officer Francis arrived at the station about 6:30 p. m. that day and conversed with the defendant in the interrogation room; the officer testified that Officer Francis did not interrogate defendant, but merely spoke with him. Officer Burns testified that Officer Francis asked defendant, "Do you remember me?" to which the defendant replied, "No." Officer Francis then looked at the defendant's infected wrist, but did not state that the defendant had not been shot.

Officer Burns further testified that defendant was then placed in a five-man lineup which was viewed by Officer Francis. A second lineup was conducted about two hours later which included the defendant and the same four men who were in the first lineup. The second lineup was viewed by James and Fred Graziano, both of whom were present in the store at the time of the incident, and both of whom identified defendant as one of the participants therein. The second lineup was also viewed by victims of other robberies; one of the parties viewing the lineup failed to identify the defendant, but that party had no relationship to the instant matter.

With respect to the makeup of the two lineups, Officer Burns testified that the men who were placed in the lineup with the defendant ranged in height from five feet, ten inches, to six feet, one or two inches. Defendant's height was about five feet, ten inches. One of the men in the lineup was described as "light complected," another as "very dark" and defendant as "dark." Defendant and another of the men wore mustaches.

Officer Neil Francis testified that he spoke to the defendant in the interrogation room just prior to identifying him at the lineup later that same day. The officer testified that he asked defendant how he injured his wrist, that the defendant replied that he had burned it, and that the officer turned to Officer Burns and laughed.

Two other police officers in attendance after defendant was brought to the station testified that he was placed in three lineups on January 20th, two relating to the instant matter and one unrelated. All of the officers who took part in the interrogation of the defendant denied beating or intimidating him in any manner.

At trial the evidence for the People was that on the afternoon in question, two men invaded the store belonging to Fred Graziano, and by means of a shotgun

317

fired pellets into the back of Gaetano Pampinella, causing his death, and fled with over $300 in cash. Fred Graziano identified the defendant as the shorter of the two men, stating that he was "the man who had the handgun."

As the assailants were departing the store after the robbery and shooting, they encountered Officer Francis at the front door, who was just about to enter the premises. The officer testified that he had his hand on the outer doorknob at the same time that defendant had his on the inner doorknob. The officer stated that, "I proceeded to open the door and as I opened up the door there was a short . . . fellow. He looked at me and I looked at him and he glanced over to his right and looked up and I saw a tall . . . fellow. They both looked at me and they proceeded on by me and as I walked in the door closed. . . ." The officer identified the defendant as the smaller of the two men. The officer then went into the store and found that a crime had been committed. He returned to the street, saw the taller man enter the passenger side of an automobile driven by a third man, and fired three shots at the automobile, striking the rear window. Officer Francis further testified that the day was cold and clear, and that he stood 12 to 18 inches from the defendant when he entered the store.

A truck driver testified that he observed a collision near Peoria and Adams Streets between an automobile with a hole in the rear window and a parked vehicle. The witness testified that three men abandoned the vehicle and ran on foot. The sawed-off shotgun used in the robbery and murder was later found in the abandoned automobile.

Defendant raised the defense of alibi. He testified that he was at home with his mother and his sister-in-law at the time of the incident; the mother and sister-in-law verified this from the witness stand. Defendant fur-

318

ther testified that he later visited his girl friend and spent the rest of the afternoon with her and her father.

One of the police officers who investigated the incident was called as a defense witness and testified that he obtained a description of the smaller robber from persons at the scene. It showed the suspect to have been five feet, seven inches in height and weighing one hundred forty-five pounds.

Defendant first contends that Officer Francis' testimony identifying defendant as one of the robbers should not have been admitted into evidence for the reason that his pretrial identification of the defendant at the lineup was tainted by the improper confrontation between the two men in the interrogation room immediately preceding the lineup. He argues that, absent emergency situations, such one-man confrontations are in themselves violations of due process, citing Stovall v. Denno, 388 US 293, and United States v. Gilmore, 398 F2d 679.

■ The Illinois Supreme Court has held, since the decision in the Stovall case, that an in-court identification may be admitted into evidence where it is shown to have had an origin independent of a possibly tainted pretrial identification. People v. Nelson, 40 Ill2d 146, 238 NE2d 378. The ability of a witness to identify a suspect cannot be said to have been erased from his mind merely because he improperly saw the suspect prior to the lineup. People v. Cook, 113 Ill App2d 231, 252 NE2d 29.

■ The record reveals that Officer Francis' in-court identification of the defendant had an origin independent of the pretrial identification. He testified that he observed the defendant face to face, from a distance of 12 to 18 inches, as defendant and his confederate were leaving the Graziano store. The time was early afternoon and the day was clear. Finally, the eyewitness was a

319

police officer with almost 13 years of service on the force.

(It should be noted that William Lee, who was indicted with defendant and Washington on the murder charge, was found guilty and was sentenced to death. The conviction in that case was appealed directly to the Illinois Supreme Court, Lee contending, among other things, that improper pretrial confrontations between himself and three witnesses for the People rendered inadmissible their in-court identifications of him as one of the participants in the occurrence. It appears that Officer Francis there, as here, had a conversation with Lee in a cell shortly after Lee's arrest and prior to trial. It also appears that James and Fred Graziano were notified by the police that a suspect was in custody and that the Grazianos should appear at the coroner's inquest to identify him; immediately prior to the inquest, Lee was brought into their presence by the officers, handcuffed to defendant Anderson, whom the Grazianos had previously identified at the January 20th lineup. The evidence at trial as to the existence of an independent origin of the Grazianos' in-court identifications was held to be inadequate, and the Supreme Court vacated the judgment against Lee, pending a hearing by the trial court at which the People were allowed the opportunity to establish by clear and convincing evidence that "each witness' identification had an origin independent of the unnecessarily suggestive confrontation at the coroner's inquest." People v. Lee, 44 Ill2d 161, 254 NE2d 469, decided December 1969, at page 6 of opinion. It is significant that, although the Supreme Court noted that Lee contended that Officer Francis' in-court identification was inadmissible, as above stated, the Court addressed itself solely to the contention regarding the Grazianos and the confrontation before the coroner's inquest.)

Defendant next contends that the lineup at which he was identified by James and Fred Graziano was "un-

necessarily suggestive and conducive to irreparable mistaken identification" and that the trial court consequently erred in denying his motion to suppress the identification testimony of Graziano. The trial court, at the hearing on the motion, was to consider the "totality of the circumstances" surrounding the confrontation. (See Stovall v. Denno, 388 US 293.) There was a conflict in the evidence as to the makeup of and the circumstances surrounding the lineup which was a matter of credibility for the trier of fact.

The People's evidence adduced at the hearing was that the defendant was placed in the lineup with four other male adults. Defendant was as tall as one of the other men in the lineup, and his complexion was within the range of the other men's complexions. Defendant's contention that he was the only man in the lineup with a mustache is contradicted not only by the People's evidence, but also by his own testimony on rebuttal, that one of his two companions, with whom he was taken into custody near the pool hall and who was also shown in the lineup with defendant, also wore a mustache.

The fact that there were police officers in the room where the lineup was conducted in no way suggested that the defendant was the suspect to be identified in this matter; defendant himself testified that the handcuffs were removed before he was brought into the lineup room and that the other men in the lineup were brought into the lineup room from other rooms. Finally, the fact that defendant was not represented by counsel at the time he appeared in the lineup is not, of itself, a violation of due process. The lineup in question was conducted prior to the effective date of United States v. Wade, 388 US 218, and Gilbert v. California, 388 US 263, nor had an indictment been returned against the defendant. (See Stovall v. Denno, supra.) The trial court did not commit error in denying the motion to suppress the identification testimony.

█ The final point raised by defendant is that he was denied the right to elicit the address of Fred Graziano on cross-examination.

When Fred Graziano was asked his address on direct examination, he stated that he would rather not give it. Defense counsel thereafter on cross-examination, requested the address and the witness again stated that he would rather not give it. After a side-bar conference between the court and counsel, an objection to defense counsel's request was sustained.

Defendant relies upon such cases as Smith v. Illinois, 390 US 129, and Garafolo v. United States, 385 F2d 200, in support of his position. Those cases involve traffic in narcotics and deal with the latitude allowed in the cross-examination of police narcotics informers. Those decisions state that where an informer's credibility is in question, the defense should be allowed to elicit his name and address, for the reason that it would "open countless avenues of in-court examination and out-of-court investigation" in exposing falsehood. (See, e. g., Smith v. Illinois, 390 US 129, 131.)

In the instant case, however, defendant was supplied with both the witness' employment address and home address prior to trial, on the list of prospective People's witnesses. Further, the addresses were read to the jury without objection by the defendant. No restriction was placed on defendant's cross-examination or out-of-court investigation opportunities by the trial court's ruling. It clearly appears that the defense's question was intended only to annoy the witness. See Alford v. United States, 282 US 687, 694.

For these reasons the judgment is affirmed.

Judgment affirmed.

McCORMICK, P. J., and LYONS, J., concur.