THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
HIRAM BROWN (Impleaded), Defendant-Appellant.

First District (3rd Division)   No. 61606

Opinion filed July 29, 1976.

James J. Doherty, Public Defender, of Chicago (Thomas F. Finegan, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Eugene J. Rudnik, Jr., and Bertina E. Lampkin, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

The defendant, Hiram Brown, was indicted for murder and four attempts to commit armed robbery. After being severed from his three co-defendants, Brown was tried by a jury and found guilty on all counts. The trial court sentenced him to 50-70 years for murder and to four concurrent 10-20 year terms for the four counts of attempt armed robbery. In this appeal he contends (1) that he should be discharged because he was not brought to trial within 120 days after he answered ready for trial or (2) that his conviction should be reversed because the trial court committed reversible error when it allowed the State to introduce photographs which were the product of an illegal search or (3) that the sentences he received for attempt armed robbery should be reduced because they do not comply with the applicable provisions of the Unified Code of Corrections.

■■ The defendant's third point can be disposed of readily. Attempted armed robbery is a Class 2 felony. (Ill. Rev. Stat. 1973, ch. 38, par. 18—2; ch. 38, par. 8—4(c)(2).) The minimum sentence for a Class 2 felony cannot be more than one-third of the maximum sentence set by the court. (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—1(c)(3).) The State concedes that the concurrent minimum sentences imposed on the defendant for attempt armed robbery were wrong and that they should be reduced from 10 years to 6 years and 8 months.

On the night of July 14, 1971, Hiram Brown and three other men attempted to rob a lounge and restaurant on East 79th Street, Chicago. Upon entering the lounge, which was separated from the restaurant by an alcove, Brown, who was wearing a wide-brimmed, white hat trimmed in black and a green jacket, and carrying a .45-caliber automatic pistol, announced a holdup. One of his companions went through the alcove towards the restaurant. Brown ordered all the customers in the lounge to put their hands on the bar and not to look around. When the robbery was announced, Henry Dale, a deputy United States marshal who was a customer in the restaurant, shot the robber who had entered the alcove. Brown stepped into the alcove and shot Dale in the head. After telling his accomplices that there was a policeman in the restaurant, Brown ordered everyone in the barroom to lie on the floor. He and his two remaining companions then fled.

An off-duty policeman, who was parking his car across the street from the lounge, heard the shooting and saw the three men come out of the bar

and disappear into a closed garage. One of the men was wearing a large white hat and carrying a gun.

Another policeman received a radio message about an officer having been shot and was told to watch for three men riding in a black and white Cadillac. The policeman and his partner saw the Cadillac and chased it. As the car slowed down, an object was thrown from its right side. A man jumped out of the same side and two others jumped from the left side and all managed to escape. The car came to a halt when it crashed into some parked cars.

Three hats were recovered from the interior of the Cadillac—one of them was white, trimmed in black. A .45-caliber automatic was found 60 feet away and a green jacket was discovered in the vicinity. No fingerprints were found on the automatic, but one, discovered on the inside rear-view mirror of the car, matched one of Brown's. The discharged shells, found in the lounge, had been fired by the automatic.

The hat and the automatic were identified at the trial by the bartender, who said they were like the ones used by Brown during the robbery attempts. But Brown testified that neither they nor the green jacket belonged to him. Brown admitted that he knew all of the men accused of the crimes and that he had driven the Cadillac the afternoon of July 14, but he denied being in it that night.

On cross-examination, Brown was asked if he was wearing a wide-brimmed white hat on July 14. He replied:

"A. No I wasn't. I don't even wear hats.

Q. You don't wear hats?

A. No."

Brown also denied having owned or possessed a .45-caliber automatic. The prosecutor then showed him two photographs which had been found in his home. In one, Brown was wearing a white, black-trimmed, wide-brimmed hat and was holding a .45 automatic in one hand and a .38 revolver in the other. In the second picture, Brown was holding the same guns, but was hatless. An objection was made to these pictures, but it was overruled and they were received in evidence.

The admission of these pictures into evidence, and their seizure from Brown's home, comprise his contention that such serious error was committed that his convictions must be reversed. Considerable space is devoted in both his and the State's brief in arguing whether the search of Brown's residence and the seizure of the photographs were legal. In our view, it is unnecessary to discuss the search and seizure. The court found that it was constitutionally permissible, but whether it was or not is not controlling. The State did not introduce the photographs as substantive evidence of the crimes charged. The State used the photos to impeach

Brown's credibility as a witness after he had testified that he never wore hats or possessed an automatic pistol.

■■ A State cannot violate the fourth amendment right of a defendant to be free from unreasonable searches and seizures and then use the fruits of such unlawful conduct to secure his conviction. Nor can a State make indirect use of such evidence in its case-in-chief. However, when a defendant testifies falsely he becomes subject to contradiction; he lays himself open to evidence impeaching his credibility even though the evidence may have been unlawfully seized. (*Walder v. United States* (1954), 347 U.S. 62, 98 L. Ed. 503, 74 S. Ct. 354.) In *Walder* the rebuttal testimony concerned evidence that had been suppressed because of its illegal seizure. The court, in finding that the use of this evidence did not violate the fourth amendment, stated:

"It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the *Weeks* doctrine would be a perversion of the Fourth Amendment.

\* \* \* Of course, the Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief. Beyond that, however, there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility." 347 U.S. 62, 65, 98 L. Ed. 503, 507, 74 S. Ct. 354.

■■ Brown not only denied the crimes with which he was charged, he denied owning the white hat and the .45-caliber automatic which were produced as exhibits by the State. But his denials did not stop there; when asked by the prosecutor whether he was wearing a white hat the night the crimes were committed, he responded: "No I wasn't. I don't even wear hats." This volunteered statement on a material issue opened the door to impeaching evidence. The court properly allowed the State to introduce the pictures for the permissible purpose of contradicting his testimony and impeaching his credibility as a witness.

Brown contends that he was not brought to trial within 120 days of the last continuance in which he concurred, and consequently the court erred when it denied his motion for discharge. After the murder of Henry Dale, Brown fled to Ohio and lived under an assumed name. He was shot while

there and was hospitalized. He was arrested in the hospital and brought back to Chicago on a stretcher on August 5, 1971. He was indicted on October 7, 1971, and subsequently filed motions for discovery, for a severance and for continuances. On May 30, 1972, he filed a motion to suppress the evidence the police had taken from his home. Continuances by agreement postponed the case to August 8 when he answered ready for trial. The case was continued several more times either by order of the court or on the motion of the State until November 30, 1972, when a hearing was held on Brown's motion to suppress. At the conclusion of the testimony, the court said that it could not hear argument on the motion that day. Brown's attorney stated the issue was so clear that argument was not required. The court stated, however, that its ruling would be made on December 8, and the case was continued on the court's motion to that date. An assistant State's attorney mentioned that the defendant's 120-day term would end the 6th of December. The court stated that there was no problem because Brown's motion to suppress was dilatory and the delay in his trial was due to his motion and the court's hearing the motion.

On December 8 the court denied the motion to suppress. Although Brown's counsel had declared—from his viewpoint—that the issue was simple, it was not and the court did not find it so. The court explained the reasons for its decision in a lengthy, well-considered, written opinion. Brown's counsel immediately presented a motion for his client's discharge because he had not been brought to trial within 120 days from the day he announced he was ready for trial. The court denied the motion, ruling that the filing and hearing on the motion to suppress had tolled the running of the statute.

■■ The right to a speedy trial is an absolute right conferred by the Federal and State Constitutions and expressly limited to 120 days by statute. (*People v. Williams* (1971), 2 Ill. App. 3d 993, 278 N.E.2d 408; Ill. Rev. Stat. 1971, ch. 38, par. 103—5(a).) However, a delay for which the defendant is responsible tolls the 120-day period. (See *People v. Lee* (1969), 44 Ill. 2d 161, 254 N.E.2d 469.) A motion to suppress, if it entails the hearing of testimony, necessarily causes delay which is directly attributable to the defendant.

The defendant's motion to suppress the photographic evidence taken from his home by the police was made two months before the date he answered ready for trial. The motion was not heard until six months after it was made. The defendant complains that the "State made no effort to call up the motion for a hearing." But neither did the defendant. (See *People v. Stock* (1974), 56 Ill. 2d 461, 309 N.E.2d 19.) Moreover, the motion was heard within the 120-day term and was completed with the exception of the court's decision. The court had no duty to make an instant decision. It had the right to take the matter under advisement,

which it did, and there was no unreasonable delay—only eight days—between the conclusion of the hearing and its decision.

The defendant must share the responsibility for the delay of his trial, and the court did not err in denying his motion to be discharged.

The judgments of conviction are affirmed. The sentences are affirmed with the exception of those imposed on the defendant for attempt armed robbery, which will be changed from 10 to 20 years, to 6 years, 8 months to 20 years.

Sentence modified; affirmed as modified.

MEJDA, P. J., and McGLOON, J., concur.