THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JERRY JOHNSON, Defendant-Appellant.

First District (2nd Division)    No. 61339

Opinion filed November 3, 1976.

James J. Doherty, Public Defender, of Chicago (David W. Hirschboeck, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Michael E. Shabat, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE HAYES delivered the opinion of the court:

Jerry Johnson (hereinafter defendant) was convicted of armed robbery (Criminal Code, section 18—2, Ill. Rev. Stat. 1973, ch. 38, par. 18—2) and rape (Ill. Rev. Stat. 1973, ch. 38, par. 11—1) in a jury trial and sentenced to concurrent prison terms of 8 to 24 years. On appeal, defendant contends: (1) the trial court erred by refusing to excuse two prospective jurors for cause; (2) the trial court improperly restricted the scope of the pretrial hearing on defendant's motion to suppress identification testimony; and (3) the conduct of the prosecution in presenting its case improperly appealed to the passions and prejudices of the jury and thereby denied defendant due process of law.

On 5 August 1973, at approximately 2 to 2:30 a.m., prosecutrix and her husband were walking in the vicinity of Lake and Wood Streets in Chicago, Illinois. They were approached by three men. One of the men, later identified by prosecutrix as defendant, placed a gun against her right side and told her to keep walking. Prosecutrix testified at trial that, as she and her assailant walked, she was able to observe her assailant's profile by the street lights of the Lake-Wood intersection. The husband was taken away in the opposite direction by the other two men.

Prosecutrix was directed to walk down a nearby alley and behind a housing project. The assailant stood facing her, gun in hand, and demanded any money she had with her. He seized her purse and removed $80 to $90 from it. With the aid of building and street lights, prosecutrix was able to see her assailant's face during this encounter. Prosecutrix was then ordered to walk around a fence by some bushes. There the assailant forcibly had sexual relations with her. Afterwards,

prosecutrix was permitted to leave the area. She walked to Madison Street, where she met an unidentified man who hailed a passing police car. A police officer transported her to Cook County Hospital and she received medical treatment. A physical examination showed the presence of motile spermatozoa. No trauma was shown by the examination.

The entire episode, from the time prosecutrix was first approached until she was permitted to leave the scene of the rape, consumed approximately 20 minutes. Prosecutrix testified that she was able to view her assailant's face for approximately eight of those 20 minutes.

At the hospital, prosecutrix was interviewed by Chicago Police Department Investigator Kaplan. She was shown a series of eight photographs, and identified one of the photographs (that of defendant) as a photograph of the man who had robbed and raped her.

On 12 August 1973, at approximately 3:45 a.m., defendant was arrested in the general vicinity of the incident. The next day, prosecutrix viewed a lineup of defendant and four other men, at which Kaplan was again present. Again defendant was identified by prosecutrix.

An in-court identification of defendant was also made by complainant. At that time she noted that defendant had light and dark blemishes on his cheeks, as did her assailant on the morning of the incident.

The defendant presented evidence that he was not present in the Lake-Wood vicinity on the morning of the incident. Defendant testified he spent the entire night at his home with his girl friend, Linda Mitchell. Mitchell testified and corroborated that defendant was with her continuously that night, with the exception of two short intervals in which he left the bedroom to bring back food. Defendant's mother, Delores Johnson, testified she saw defendant in the kitchen of their home at 11 p.m. on 4 August 1973, cooking something to eat. Defendant returned to the bedroom and was not seen again by her until morning. Also testifying was defendant's brother, Derrick Johnson, who stated he saw defendant briefly at 10 p.m. on 4 August 1973 in their home.

OPINION

## I.

The first issue raised is whether the trial court erred by refusing to excuse two veniremen who were challenged for cause by defendant. Defendant contends that the voir dire testimony of the two prospective jurors, Garrity and Griffin, revealed bias and prejudice which rendered them unable to reach a verdict fairly and impartially. The prejudice resulting from the alleged error is that defendant was thereby compelled to use two of his 10 peremptory challenges in order to remove Garrity and Griffin from the panel; then, when he had exhausted his 10 peremptory challenges, he was thereafter compelled to accept a competent juror (one

Mrs. Marrero), but one whom defendant simply found unacceptable for his own private reasons and whom he would have challenged peremptorily, had he had a peremptory challenge left at that time. It is not contended that that competent but unacceptable juror exerted any special influence upon the verdict. Defendant cites an Iowa case (*State v. Beckwith* (1951), 242 Iowa 228, 46 N.W.2d 20) which supports this concept of the nature of the prejudice.

Defendant initially waived reporting of the voir dire proceedings. But after the trial judge refused to excuse jurors Garrity and Griffin for cause, a side bar conference was held and reported. The remainder of the voir dire examination was then conducted in the presence of a court reporter, transcribed, and made a part of the record.

At the side bar conference, as reported, the following colloquy took place between defense counsel and the trial court:

"MR. PTACEK [defense counsel]: We were in the middle of the jury selection in the last panel. One of the prospective jurors, Mr. Garrity (phonetic) said his daughter some years ago was a victim of an attempt rape. In response to Mr. Harris' [defense co-counsel's] question he said maybe this would affect his judgment in this matter. There was also a Miss Danovsky[1] (phonetic) who had been the victim of an attempt robbery in which she had been beaten up six years ago. There was also Miss Virginia Griffin who said that the defendant had to prove his innocence. Based upon Mr. Garrity and Miss Griffin we asked the Court for cause. The Court refused to dismiss them for cause. At that time we asked the court reporter to be present on the rest of the venire jury selection.

THE COURT: I didn't hear anything like that.

MR. PTACEK: I did. I came up to the bench. I said, Judge, we want the court reporter—

THE COURT: For a side bar.

MR. PTACEK: I said for the rest of the voir dire, and you said we waived.

THE COURT: I didn't know where the court reporter was. I said at the recess you could put anything else on the record. If you want the reporter for the rest, fine.

* * *

MR. PTACEK: We had originally waived. We asked after the Court refused to excuse the two jurors for cause.

THE COURT: It is still. I didn't hear any cause. Mr. Garrity said specifically four or five times he would do his utmost. He had to live with it. He thought he could make a good juror, impartial

---

[1] Juror Delinski (here miscalled Danovsky) was not challenged by defendant.

juror, in response to Mr. Harris as well as Mr. Breen. And even Mrs. Griffin you are talking about—

MR. PTACEK: Yes, Virginia Griffin.

THE COURT: The last couple of questions she said she made a mistake when she answered that before, she understood it now. As far as this other girl who was a victim six years ago, she said she could put that out of her mind.

MR. BREEN [Assistant State's Attorney]: Mr. Garrity used the phrase attempt rape. When it came down to exactly what happened to his daughter it appears from the limited information she wasn't exactly the victim of attempt rape as the law would so define it.

THE COURT: He did indicate that neither he nor his daughter went to a police station. But his answers were so specific he was going to try to be as good a juror as he possibly could. Throughout the many questions he said he would do his utmost, his best. That is it.

MR. PTACEK: But the last question before Mr. Harris asked for cause, he said would this affect you. He said yes.

THE COURT: He didn't say yes. He said it could. You had a chance to interrogate him some more, attacking over and over the prospective jurors in an answer to a leading question for the purpose of obtaining cause, and his answers were so general, he would do his best, try to put it out of his mind. That is all you can expect of any prospective juror is to do his best. Naturally any possible answer you can receive from a leading question, but that doesn't give cause."

Defendant then exercised two peremptory challenges to remove Garrity and Griffin. At this point nine of defendant's statutory allotment of 10 peremptory challenges had been used. (Code of Criminal Procedure, section 115—4(e), Ill. Rev. Stat. 1973, ch. 38, par. 115—4(e).) When an additional peremptory challenge was subsequently exercised to excuse another prospective juror, defendant's allotment of peremptory challenges was completely exhausted. An additional peremptory challenge was sought to excuse another prospective juror. The request was denied by the trial court and the juror was allowed to serve. It is not contended that this juror was incompetent or unqualified ("An Act concerning jurors, * * *," section 14, Ill. Rev. Stat. 1973, ch. 78, par. 14), but rather that she was simply unacceptable to defendant.

An individual is not competent to sit as a juror if his state of mind is such that, with that individual on the jury, a party will not receive a fair and impartial trial. The burden of proving that a juror possesses a

disqualifying state of mind rests on the challenging party. The determination of whether a challenge for cause should be allowed rests within the sound discretion of the trial judge, and his ruling will not be set aside unless it is against the manifest weight of the evidence. *People v. Cole* (1973), 54 Ill. 2d 401, 298 N.E.2d 705; *People v. Harris* (1967), 38 Ill. 2d 552, 232 N.E.2d 721.

Defendant's principal cases in support of his position that the trial court abused its discretion in denying the challenges of Garrity and Griffin for cause are *People v. Cravens* (1941), 375 Ill. 495, 31 N.E.2d 938, and *Coughlin v. People* (1893), 144 Ill. 140, 33 N.E. 1. In *Cravens*, a prospective juror expressed to a friend, with whom he was sitting in the courtroom during argument of a motion to quash the indictment, a decided opinion as to the merits of the case prior to the selection of the jury; he also said to the friend that he knew about the defendant. However, in response to questions posed during voir dire, he stated that he knew nothing about the defendant, had not expressed any opinion as to the defendant's guilt or innocence, and had no opinion as to defendant's guilt or innocence. The reviewing court ruled it was error to deny defendant's motion for a new trial based on this prior expression of opinion previously unknown to defense counsel. "It was a cardinal rule at common law that jurors, to be qualified as impartial, should stand indifferent between the parties and be wholly free from even the suspicion of bias. This must be so if the constitutional guaranty of trial by an impartial jury is to be had." (375 Ill. 495, 497, 31 N.E.2d 938, 939.) *Coughlin* involved the competency of two jurors who expressed opinions as to the accused's guilt, but who claimed they could render a fair and impartial verdict. Defendant's challenges for cause were denied by the lower court. Since all of defendant's peremptory challenges had by then been used, these two individuals were allowed to sit as jurors. The court reversed the conviction and held these jurors incompetent because they were not free from suspicion of bias.

The *Cravens* and *Coughlin* decisions were criticized by our supreme court in *People v. Cole*. In *Cole*, a juror was allowed to sit despite a number of indications of possible bias. The juror was acquainted with the State's Attorney and the Assistant State's Attorney, with the deceased whom defendant was accused of murdering, and with a State's witness. He was remotely related to another State's witness. Also, he had recently served as treasurer of the campaign fund for the local sheriff. When asked if these relationships would influence his opinion, the juror answered: "I'm human like everybody else, but I would generally—no." He further stated he had no opinion as to the guilt or innocence of defendant. Defendant had previously exhausted his peremptory challenges. The lower court denied defendant's challenge for cause.

The supreme court ruled that the lower court's determination of competency was not against the manifest weight of the evidence. The language of *Cravens* and *Coughlin* that a juror must be free from even a suspicion of bias was said to be a misconception of the law. "The determination of the qualification of the juror is a judicial determination. This determination by the court, like the determination of any other issue of fact, must be made from the evidence." 54 Ill. 2d 401, 415, 298 N.E.2d 705, 713.

Thus, we are required to review the evidence in order properly to assess the trial court's exercise of discretion in the instant case; if the determination that Garrity and Griffin were qualified jurors is not against the manifest weight of the evidence, we must affirm the trial court's denial of the challenges for cause. However, because of the incomplete state of the record as to the voir dire in the instant case, we are precluded from adequately reviewing the evidence. The record of the side bar conference does not provide us with sufficient detail as to the exact nature of the court's questions and of the jurors' responses. There is a significant disagreement between the court and counsel as to Garrity's response to the question of whether the attack on his daughter would affect his judgment. Defense counsel believed the response was yes; the trial court believed Garrity said it might, but that he would do his best to put it out of his mind. As for Griffin, we know only that she initially stated that defendant must prove his innocence and later stated that she now realized she was mistaken and "understood it now."

■■ In *People v. Murray* (1966), 73 Ill. App. 2d 376, 220 N.E.2d 84, this court was faced with an almost identical situation. Defense counsel waived reporting of the voir dire proceedings. However, the record did contain a discussion between counsel and the trial judge, including the latter's summarizations of the voir dire. This court refused to consider defendant's contention on review that a biased juror had been allowed to sit despite a challenge for cause. We stated:

> "The basis for this contention is necessarily the juror's answers to questions and the circumstances making up his voir dire examination. As previously noted, that examination does not appear in the record although, again, there is colloquy relating to the questioning of the allegedly biased juror. This colloquy alone is insufficient to enable us to independently evaluate the issue of the juror's alleged bias. The proper determination of bias, if any, is dependent upon the exact language of the questions and answers and the context within which they were given. Absent such facts, a determination of the charge of bias would be grounded on mere speculation and surmise." 73 Ill. App. 2d 376, 381-82, 220 N.E.2d 84, 87.

We have the same difficulty in the instant action in the absence of the exact questions and answers on the voir dire examination. Responsibility for proper preservation of the record of proceedings, including the voir dire, rested with defendant. (*People v. Turner* (1976), 35 Ill. App. 3d 550, 342 N.E.2d 158.) We cannot consider defendant's contention without an adequate record.

In view of our resolution of this issue, we do not reach the question of whether defendant was prejudiced by having subsequently exhausted his peremptory challenges and by being obliged then to accept a competent, but otherwise unacceptable juror.

## II.

Defendant next contends that the trial court improperly restricted the scope of the hearing on defendant's pretrial motion to suppress any identification testimony offered by the prosecutrix. The motion was based on a number of grounds, including the alleged impermissibly suggestive nature of the photographic display and of the lineup; the alleged impermissibly suggestive conduct of the police; and the alleged impairment of the prosecutrix's ability to make a fair photographic or lineup identification owing to her emotional and physical condition at the time. The motion requested the suppression of the photographic and lineup identifications and of any in-court identification tainted thereby.

At the hearing on the motion, prosecutrix, Officer Kaplan, and Officer Soltys (who attended the lineup) testified. Their testimony revealed the following.

Kaplan had handed the prosecutrix eight photographs in the hospital room within two hours after the incident and had asked her to look through them. The photographs were all color pictures of the same size. Each photograph pictured the head and shoulders of a different man. Defendant was the only man pictured without a shirt, but Kaplan testified that defendant's photograph was the only photograph he had of defendant. After having viewed the photographs for three or four minutes, prosecutrix had picked defendant's photograph as that of her assailant. Eight days later, Kaplan had brought the prosecutrix to the police station to view a lineup; he had not informed her that a suspect was in custody. Defendant and four other men had participated in the lineup, which was conducted by Kaplan. Defendant had requested, and had received, the center position in the lineup. The procedure was that each man step forward, do a couple of side facings, and step back into the line. Prosecutrix had again identified defendant.

But, in sustaining objections by the State, the trial court refused to permit either prosecutrix or Kaplan to testify as to the description of her

assailant which prosecutrix had given to Kaplan on the morning of the incident and before the photographic identification had been made. The court ruled that the matter of the said description was beyond the scope of, and irrelevant to, the motion to suppress identification testimony. No offer of proof was made by defendant, but we will assume that defendant was attempting to establish a substantial variance between the said description of the assailant and the actual description of defendant. The exclusion of testimony as to the said description constitutes the allegedly improper restriction on the scope of the hearing of defendant's motion to suppress, by which defendant was allegedly deprived of a fair hearing on the said motion.

In disposing of this contention, it is necessary to distinguish sharply between the admissibility, in a hearing on a defendant's motion to suppress, of a substantially variant description of the assailant given to police before any identification of defendant was made, and its admissibility generally for the sole purpose of diminishing the probative value of the identification testimony. It is further necessary to focus sharply on the precise stage of the hearing on the motion to suppress at which certain cases cited by defendant have held evidence of such a substantially variant description to be admissible. For the sake of clarity, we state in advance that we hold that the exclusion of the testimony as to the description of her assailant given by prosecutrix to Officer Kaplan before any identification had been made was not an improper restriction of the scope of the hearing on defendant's motion to suppress and was not error.

In *People v. Tuttle* (1972), 3 Ill. App. 3d 326, 330, 278 N.E.2d 458, 461, this court summarized the law concerning the suppression of in-court identification testimony as follows:

"In order to suppress an in-court identification on the ground of improper pre-trial identification procedures, a defendant bears the burden of proving two facts. First, he must establish that the pre-trial identification procedures were so suggestive as to give rise to a very substantial likelihood of irreparable misidentification. (*Simmons v. United States*, 390 U.S. 377, 384; *People v. Holiday*, 47 Ill. 2d 300, 307-308.) Second, to the extent that suggestive procedures are established, they must be shown to have been 'unnecessary' under the totality of the circumstances. (*Stovall v. Denno*, 388 U.S. 293, 302; *People v. Lee*, 44 Ill. 2d 161, 169.) However, even if a defendant successfully established the above two elements, an in-court identification may nonetheless be admissible if the State shows 'by clear and convincing evidence, that such in-court identification had an independent origin, arising

from other uninfluenced observation of the defendant.' *People v. McMath,* 104 Ill. App. 2d 302, 313; affirmed, 445 Ill. 2d 33; see also *People v. Fox,* 48 Ill. 2d 239, 245."

In the instant case, defendant failed to sustain his burden of proving the first fact referred to above in *Tuttle, i.e.,* that the pretrial identification procedures were impermissibly suggestive. There was no evidence presented of any improper influence resulting from the actions of the investigating officers. The only possible suggestiveness of the photographic display was that defendant was the only man pictured without a shirt. But Officer Kaplan testified that that photograph was the only photograph he had of the defendant, so that, for that reason, the possible suggestiveness was not unnecessary. There was no evidence that the lineup procedure was improper in any manner. We conclude, therefore, that these pretrial identifications were not shown to be so suggestive as to give rise to a substantial likelihood of an irreparable misidentification.

Hence, in the instant case, we do not reach that stage of the hearing on the motion to suppress at which it became necessary for the State to rely upon the doctrine of prior independent origin for the admissibility of an in-court identification. Had that stage of the hearing been reached, then, as the cases cited by defendant hold, a substantial variance between a pre-identification description given by an identification witness on the basis of an alleged prior independent observation of an accused, and an accused's actual description is a factor which should be considered in determining whether an in-court identification is in fact independent of the suggestive identification; and the substantially variant pre-identification description *then* becomes admissible in the hearing on the motion to suppress, because it tends to cast doubt on the adequacy of the independent observation as a basis for the in-court identification. (*United States v. Wade* (1967), 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926; *People v. Blumenshine* (1969), 42 Ill. 2d 508, 250 N.E.2d 152; *People v. Bates* (1973), 9 Ill. App. 3d 882, 293 N.E.2d 358; *People v. Robinson* (1970), 46 Ill. 2d 229, 263 N.E.2d 57.) But because the hearing in the instant case had not reached that stage, the trial court's ruling that the substantially variant pre-identification description which prosecutrix gave of her assailant was beyond the scope of, and irrelevant to, the motion to suppress was correct.

■■ At first blush, it may seem illogical to say that the substantially variant pre-identification description is beyond the scope of, and irrelevant to, the hearing on the motion to suppress (unless the photographic or lineup identification has been shown to have been impermissibly suggestive so that the State must then show a prior independent basis for an in-court identification), because the said description is clearly relevant in that it impeaches the credibility of any

subsequent identification of a defendant by the witness who initially gave the substantially variant description. This is true. But one must remember that the fact that an otherwise valid photographic or lineup identification is impeached by the said prior description is not a ground for the *suppression* of the photographic or lineup identification. It is for that reason that the said prior description is beyond the scope of, and irrelevant to, the hearing on the motion to suppress (with the exception parenthetically noted just above).

### III.

■■ Defendant's final contention is that this cause should be reversed and remanded because of the manner in which the prosecution appealed to the passions and prejudices of the jury. Apparently as a result of the rape, prosecutrix's husband deserted her shortly thereafter and the marriage was separated. This was an irrelevant matter which should not have been brought to the attention of the jury. On inspection, however, the record discloses three occasions on which reference to this fact was made before the jury. The first reference was made by the State in its opening statement, which reference prompted an immediate objection by defense counsel which was sustained by the trial court with an admonition to the prosecutor to "confine your remarks to the evidence." The second reference was made during the direct examination of prosecutrix by the State. Over a defense objection which was overruled by the trial court, prosecutrix was allowed to testify that her husband "is in Arkansas some place. I don't really know. After this we separated." The final reference was made by defense counsel during his closing argument. Defense counsel argued that sympathy for prosecutrix because her husband had left her should not be used to convict defendant.

It is not specifically contended that the trial court committed *reversible* error by overruling the defense objection during the direct examination of prosecutrix. Rather, defendant's position is that he was denied due process of law by the conduct of the State in presenting its case. The State responds, correctly we believe, that the error is of little significance considering the strength of the State's case. We note that the State did not refer to the marriage separation during its closing argument. (*People v. McFadden* (1969), 107 Ill. App. 2d 132, 245 N.E.2d 878.) We think that whatever prejudice might have resulted was equally likely to have been caused by the reference in the defense closing argument as by the actions of the prosecutors. We conclude that defendant received a fair trial and that he was properly found guilty by the jury.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

STAMOS, P. J., and DOWNING, J., concur.